UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JUDGE KOELTL

11 CIV 6678

| | | |
|---|---|---|
| DAVID LAWRENCE, Individually and on Behalf of All Others Similarly Situated, | : | Civil Action No. |
| Plaintiff, | : | CLASS ACTION |
| vs. | : | COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS |
| BANK OF AMERICA CORPORATION, BRIAN T. MOYNIHAN, CHARLES H. NOSKI, NEIL A. COTTY and BRUCE R. THOMPSON, | : | |
| Defendants. | : | DEMAND FOR JURY TRIAL |



RECEIVED
SEP 23 2011
U.S.D.C. S.D. N.Y.
CASHIERS

## INTRODUCTION AND OVERVIEW

1.     This is a class action for violations of the anti-fraud provisions of the federal securities laws on behalf of all purchasers of the common stock of Bank of America Corporation ("BofA" or the "Company") between February 25, 2011 and August 5, 2011, inclusive (the "Class Period"), who were damaged thereby (the "Class").

2.     BofA is one of the largest financial institutions in the world.  During the Class Period, defendants misled investors by failing to disclose that BofA potentially owes American International Group, Inc. ("AIG") over $10 billion.   Specifically, between 2005 and 2007, BofA and two companies that BofA acquired – Merrill Lynch & Co, Inc. ("Merrill Lynch") and Countrywide Financial Corporation ("Countrywide") – and their subsidiaries sold AIG over $28 billion in residential mortgage-backed securities ("RMBS").  As a result of these sales, AIG suffered losses in excess of $10 billion and BofA was potentially subject to suit for those losses.

3.     Throughout the Class Period, defendants repeatedly informed investors about the claims of other entities for RMBS losses but not about the massive losses suffered by AIG.

4.     Subsequently, on August 8, 2011, AIG filed suit against BofA in New York state court seeking to recover the losses it had suffered from the RMBS that BofA, Countrywide, and Merrill Lynch had sold it between 2005 and 2007.  As a result, the price of BofA's common stock dropped from a closing price of $8.17 per share on August 5, 2011 to $6.51 per share on August 8, 2011, a decline of more than 20% in one trading day.  This decrease was a result of the artificial inflation caused by defendants' misleading statements coming out of the price.[1]

---

[1]     Plaintiff asserts only that BofA should have disclosed AIG's losses and potential claims to investors and takes no position on whether those claims will ultimately be found to have merit.

## JURISDICTION AND VENUE

5.    The claims asserted arise under §§10(b) and 20(a) of the Securities Exchange Act of 1934 ("1934 Act") and Rule 10b-5 promulgated thereunder.  Jurisdiction is conferred by §27 of the 1934 Act.  Venue is proper pursuant to §27 of the 1934 Act.  Acts giving rise to the violations complained of occurred in this District.

## THE PARTIES

6.    Plaintiff David Lawrence purchased BofA common stock during the Class Period as set forth in the attached certification and was damaged thereby.

7.    Defendant BofA is one of the world's largest financial institutions with its headquarters located in Charlotte, North Carolina.  BofA's common stock is traded under the symbol BAC on the New York Stock Exchange, which is an efficient market.

8.    Defendant Brian T. Moynihan ("Moynihan") was, at all relevant times, Chief Executive Officer ("CEO") of the Company.

9.    Defendant Charles H. Noski ("Noski") is Vice Chairman of the Company and was the Company's Chief Financial Officer ("CFO") until June 2011.

10.    Defendant Neil A. Cotty ("Cotty") was, at relevant times, Chief Accounting Officer ("CAO") and Interim CFO of the Company.

11.    Defendant Bruce R. Thompson ("Thompson") has served as CFO of the Company since June 2011.

12.    The defendants named in ¶¶8-11 are referred to herein as the "Individual Defendants."

## SCIENTER

13.    During the Class Period, the defendants had both the motive and opportunity to conduct fraud.  They also had actual knowledge of the misleading nature of the statements they made

or acted in reckless disregard of the true information known to them at the time.  In so doing, the defendants participated in a scheme to defraud and committed acts, practices and participated in a course of business that operated as a fraud or deceit on purchasers of BofA common stock during the Class Period.

## PRE-CLASS PERIOD EVENTS

14.     Between 2005 and 2007, BofA, Merrill Lynch, Countrywide and their subsidiaries sold AIG over $28 billion in RMBS.  As a result of these sales, AIG suffered losses in excess of $10 billion.

15.     BofA purchased Countrywide on July 1, 2008 and Merrill Lynch on January 1, 2009.

## FALSE AND MISLEADING STATEMENTS DURING THE CLASS PERIOD

16.     On February 25, 2011, BofA filed a Form 10-K with the SEC signed by defendants Moynihan, Noski and Cotty.  The Form 10-K stated in relevant part:

> In accordance with applicable accounting guidance, the Corporation establishes an accrued liability for litigation and regulatory matters when those matters present loss contingencies that are both probable and estimable. In such cases, there may be an exposure to loss in excess of any amounts accrued. When a loss contingency is not both probable and estimable, the Corporation does not establish an accrued liability. As a litigation or regulatory matter develops, the Corporation, in conjunction with any outside counsel handling the matter, evaluates on an ongoing basis whether such matter presents a loss contingency that is probable and estimable. If, at the time of evaluation, the loss contingency related to a litigation or regulatory matter is not both probable and estimable, the matter will continue to be monitored for further developments that would make such loss contingency both probable and estimable. Once the loss contingency related to a litigation or regulatory matter is deemed to be both probable and estimable, the Corporation will establish an accrued liability with respect to such loss contingency and record a corresponding amount of litigation-related expense. The Corporation continues to monitor the matter for further developments that could affect the amount of the accrued liability that has been previously established. Excluding fees paid to external legal service providers, litigation-related expense of $2.6 billion was recognized in 2010 compared to $1.0 billion for 2009.

> For a limited number of the matters disclosed in this Note for which a loss is probable or reasonably possible in future periods, whether in excess of a related accrued liability or where there is no accrued liability, the Corporation is able to

- 3 -

estimate a range of possible loss. In determining whether it is possible to provide an estimate of loss or range of possible loss, the Corporation reviews and evaluates its material litigation and regulatory matters on an ongoing basis, in conjunction with any outside counsel handling the matter, in light of potentially relevant factual and legal developments. These may include information learned through the discovery process, rulings on dispositive motions, settlement discussions, and other rulings by courts, arbitrators or others. In cases in which the Corporation possesses sufficient appropriate information to develop an estimate of loss or range of possible loss, that estimate is aggregated and disclosed below. There may be other disclosed matters for which a loss is probable or reasonably possible but such an estimate may not be possible. For those matters where an estimate is possible, management currently estimates the aggregate range of possible loss is $145 million to $1.5 billion in excess of the accrued liability (if any) related to those matters. This estimated range of possible loss is based upon currently available information and is subject to significant judgment and a variety of assumptions, and known and unknown uncertainties. The matters underlying the estimated range will change from time to time, and actual results may vary significantly from the current estimate. Those matters for which an estimate is not possible are not included within this estimated range. Therefore, this estimated range of possible loss represents what the Corporation believes to be an estimate of possible loss only for certain matters meeting these criteria. It does not represent the Corporation's maximum loss exposure. Information is provided below regarding the nature of all of these contingencies and, where specified, the amount of the claim associated with these loss contingencies. Based on current knowledge, management does not believe that loss contingencies arising from pending matters, including the matters described herein, will have a material adverse effect on the consolidated financial position or liquidity of the Corporation. However, in light of the inherent uncertainties involved in these matters, some of which are beyond the Corporation's control, and the very large or indeterminate damages sought in some of these matters, an adverse outcome in one or more of these matters could be material to the Corporation's results of operations or cash flows for any particular reporting period.

*   *   *

**Mortgage-backed Securities Litigation**

The Corporation and its affiliates, Countrywide entities and their affiliates, and Merrill Lynch entities and their affiliates have been named as defendants in several cases relating to their various roles as issuer, originator, seller, depositor, sponsor, underwriter and/or controlling entity in MBS offerings, pursuant to which the MBS investors were entitled to a portion of the cash flow from the underlying pools of mortgages. These cases generally include purported class action suits and actions by individual MBS purchasers. Although the allegations vary by lawsuit, these cases generally allege that the registration statements, prospectuses and prospectus supplements for securities issued by securitization trusts contained material misrepresentations and omissions, in violation of Sections 11 and 12 of the

Securities Act of 1933 and/or state securities laws and other state statutory and common laws.

These cases generally involve allegations of false and misleading statements regarding: (i) the process by which the properties that served as collateral for the mortgage loans underlying the MBS were appraised; (ii) the percentage of equity that mortgage borrowers had in their homes; (iii) the borrowers' ability to repay their mortgage loans; and (iv) the underwriting practices by which those mortgage loans were originated (collectively, the MBS Claims). In addition, several of the cases discussed below assert claims related to the ratings given to the different tranches of MBS by rating agencies. Plaintiffs in these cases generally seek unspecified compensatory damages, unspecified costs and legal fees and, in some instances, seek rescission.

### Luther Litigation and Related Actions

David H. Luther and various pension funds (collectively, Luther Plaintiffs) commenced a putative class action against CFC, several of its affiliates, BAS, MLPFS and other entities and individuals in California Superior Court for Los Angeles County entitled *Luther v. Countrywide Financial Corporation, et al.* (the Luther Action). The Luther Plaintiffs claim that they and other unspecified investors purchased MBS issued by subsidiaries of CFC in 429 offerings between January 2005 and December 2007. The Luther Plaintiffs certified that they collectively purchased securities in 61 of the 429 offerings for approximately $216 million. On January 6, 2010, the court granted CFC's motion to dismiss, with prejudice, due to lack of subject matter jurisdiction. The Luther Plaintiffs' appeal to the California Court of Appeal is currently pending.

Following the dismissal of the Luther Action, the Maine State Retirement System filed a putative class action in the U.S. District Court for the Central District of California, entitled *Maine State Retirement System v. Countrywide Financial Corporation, et al.* (the Maine Action). The Maine Action names the same defendants as the Luther Action, as well as the Corporation and NB Holdings Corporation, and asserts substantially the same allegations regarding 427 of the MBS offerings that were at issue in the Luther Action. On May 14, 2010, the court appointed the Iowa Public Employees' Retirement System (IPERS) as Lead Plaintiff. On July 13, 2010, IPERS filed an amended complaint, which added additional pension fund plaintiffs (collectively, the Maine Plaintiffs). The Maine Plaintiffs certified that they purchased securities in 81 of those 427 offerings, for approximately $538 million. On November 4, 2010, the court granted CFC's motion to dismiss the amended complaint in its entirety, and ordered the Maine Plaintiffs to file a second amended complaint within 30 days. In so doing, the court held that the Maine Plaintiffs only have standing to sue over the 81 offerings in which they actually purchased MBS. The court also held that the applicable statute of limitations could be tolled by the filing of the Luther Action only with respect to the offerings in which the Luther Plaintiffs actually purchased MBS. On December 6, 2010, the Maine Plaintiffs filed a second amended complaint that relates to 14 MBS offerings.

Western Conference of Teamsters Pension Trust Fund (Western Teamsters) filed suit against the same defendants named in the Maine Action on November 17, 2010 in the Superior Court of California, Los Angeles County, entitled *Western Conference of Teamsters Pension Trust Fund v. Countrywide Financial Corporation, et al.* Western Teamsters claims that it and other unspecified investors purchased MBS issued in the 428 offerings that were also at issue in the Luther Action. The Western Teamsters action has been stayed by the Superior Court pending resolution of the appeal of the Luther Action.

The New Mexico State Investment Council, New Mexico Educational Retirement Board and New Mexico Public Employees Retirement Association (the New Mexico Plaintiffs) have also brought an action against CFC and several of its affiliates, current and former officers, as well as third-party underwriters in New Mexico District Court for the County of Santa Fe, entitled *New Mexico State Investment Council, et al. v. Countrywide Financial Corporation, et al.* A related action was later filed against the individual defendants in California Superior Court, entitled *New Mexico State Investment Council, et al. v. Stanford L. Kurland, et al.* On November 15, 2010, the parties agreed to resolve and dismiss these two cases in their entirety with prejudice for an amount that is not material to the Corporation's results of operations.

Putnam Bank filed a putative class action lawsuit on January 27, 2011 against CFC, the Corporation, certain of their subsidiaries, and certain individuals in the U.S. District Court for the District of Connecticut, entitled *Putnam Bank v. Countrywide Financial Corporation, et al.* Putnam Bank alleges that it purchased approximately $33 million in eight MBS offerings issued by subsidiaries of CFC between August 2005 and September 2007. All eight offerings were also included in the Luther Action and the Maine Action. In addition to certain MBS Claims, Putnam Bank contends among other things that defendants made false and misleading statements regarding: (i) the number of mortgage loans in each offering that were originated under reduced documentation programs; (ii) the method by which mortgages were selected for inclusion in the collateral pools underlying the offerings; and (iii) the analysis conducted by ratings agencies prior to assigning ratings to the MBS.

Countrywide may also be subject to contractual indemnification obligations for the benefit of certain defendants involved in the MBS matters discussed above.

*    *    *

### Merrill Lynch MBS Litigation

Merrill Lynch, MLPFS, Merrill Lynch Mortgage Investors, Inc. (MLMI) and certain current and former directors of MLMI are named as defendants in a putative consolidated class action in the U.S. District Court in the Southern District of New York, entitled *Public Employees' Ret. System of Mississippi v. Merrill Lynch & Co. Inc.* In addition to MBS Claims, plaintiffs also allege that the offering documents for the MBS misrepresented or omitted material facts regarding the credit ratings

assigned to the securities. In March 2010, the court dismissed claims related to 65 of 84 offerings with prejudice due to lack of standing as no named plaintiff purchased securities in those offerings. On November 8, 2010, the court dismissed claims related to 1 of 19 remaining offerings on separate grounds. MLPFS was the sole underwriter of these 18 offerings. On December 1, 2010, the defendants filed an answer to the consolidated amended complaint.

17.     The Form 10-K was accompanied by certifications signed by defendants Moynihan and Noski, which stated in relevant part:

1.     I have reviewed this Annual Report on Form 10-K of Bank of America Corporation;

2.     Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.     Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.     The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

a)     Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b)     Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c)     Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the

effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d)    Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.    The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a)    All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b)    Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

18.    On May 5, 2011, BofA filed a Form 10-Q with the SEC signed by defendant Cotty.

The May 5, 2011 Form 10-Q stated in relevant part:

In accordance with applicable accounting guidance, the Corporation establishes an accrued liability for litigation and regulatory matters when those matters present loss contingencies that are both probable and estimable. In such cases, there may be an exposure to loss in excess of any amounts accrued. When a loss contingency is not both probable and estimable, the Corporation does not establish an accrued liability. As a litigation or regulatory matter develops, the Corporation, in conjunction with any outside counsel handling the matter, evaluates on an ongoing basis whether such matter presents a loss contingency that is probable and estimable. If, at the time of evaluation, the loss contingency related to a litigation or regulatory matter is not both probable and estimable, the matter will continue to be monitored for further developments that would make such loss contingency both probable and estimable. Once the loss contingency related to a litigation or regulatory matter is deemed to be both probable and estimable, the Corporation will establish an accrued liability with respect to such loss contingency and record a corresponding amount of litigation-related expense. The Corporation continues to monitor the matter for further developments that could affect the amount of the accrued liability that has been previously established. Excluding fees paid to external legal service providers, litigation-related expense of $940 million was recognized in

the three months ended March 31, 2011 compared to $588 million for the same period in 2010.

For a limited number of the matters disclosed in this Note, and in the prior commitments and contingencies disclosure, for which a loss is probable or reasonably possible in future periods, whether in excess of a related accrued liability or where there is no accrued liability, the Corporation is able to estimate a range of possible loss. In determining whether it is possible to provide an estimate of loss or range of possible loss, the Corporation reviews and evaluates its material litigation and regulatory matters on an ongoing basis, in conjunction with any outside counsel handling the matter, in light of potentially relevant factual and legal developments. These may include information learned through the discovery process, rulings on dispositive motions, settlement discussions, and other rulings by courts, arbitrators or others. In cases in which the Corporation possesses sufficient appropriate information to develop an estimate of loss or range of possible loss, that estimate is aggregated and disclosed below. There may be other disclosed matters for which a loss is probable or reasonably possible but such an estimate may not be possible. For those matters where an estimate is possible, management currently estimates the aggregate range of possible loss is $150 million to $1.6 billion in excess of the accrued liability (if any) related to those matters. This estimated range of possible loss is based upon currently available information and is subject to significant judgment and a variety of assumptions, and known and unknown uncertainties. The matters underlying the estimated range will change from time to time, and actual results may vary significantly from the current estimate. Those matters for which an estimate is not possible are not included within this estimated range. Therefore, this estimated range of possible loss represents what the Corporation believes to be an estimate of possible loss only for certain matters meeting these criteria. It does not represent the Corporation's maximum loss exposure. Information is provided below, or in the prior commitments and contingencies disclosure, regarding the nature of all of these contingencies and, where specified, the amount of the claim associated with these loss contingencies. Based on current knowledge, management does not believe that loss contingencies arising from pending matters, including the matters described herein and in the prior commitments and contingencies disclosure, will have a material adverse effect on the consolidated financial position or liquidity of the Corporation. However, in light of the inherent uncertainties involved in these matters, some of which are beyond the Corporation's control, and the very large or indeterminate damages sought in some of these matters, an adverse outcome in one or more of these matters could be material to the Corporation's results of operations or cash flows for any particular reporting period.

\*        \*        \*

**Mortgage-backed Securities Litigation**

*Luther Litigation and Related Actions*

On April 21, 2011, the court dismissed with prejudice the Corporation and NB Holdings Corporation as defendants in *Maine State Retirement System v. Countrywide Financial Corporation, et al.*

19.     The May 5, 2011 Form 10-Q contained certifications signed by defendants Moynihan and Noski substantially identical to those quoted above.

20.     On June 29, 2011, BofA issued a press release that stated in relevant part:

Bank of America Corporation today announced that it has reached an agreement to resolve nearly all of the legacy Countrywide-issued first-lien residential mortgage-backed securitization (RMBS) repurchase exposure, representing 530 trusts with original principal balance of $424 billion.

The settlement with The Bank of New York Mellon (BNY Mellon), the trustee for the RMBS trusts covered by the settlement, is supported by a group of major institutional investors represented by Gibbs & Bruns LLP, and is subject to final court approval and certain other conditions. With this agreement and other mortgage-related actions in the second quarter of 2011, the company believes it will have recorded reserves in its financial statements for a substantial portion of its representations and warranties exposure as measured by original unpaid principal balance. The company also is estimating a range of possible loss for the remainder.

"This is another important step we are taking in the interest of our shareholders to minimize the impact of future economic uncertainty and put legacy issues behind us," said Bank of America Chief Executive Officer Brian Moynihan. "We will continue to act aggressively, and in the best interest of our shareholders, to clean up the mortgage issues largely stemming from our purchase of Countrywide."

The agreement includes a cash payment of $8.5 billion to the covered trusts to be made after final court approval of the settlement.

*        *        *

**Settlement covers 530 RMBS trusts**

The settlement covers 525 legacy Countrywide first-lien RMBS trusts and five legacy Countrywide second-lien RMBS trusts with mortgage loans principally originated between 2004 and 2008 for which BNY Mellon acts as trustee or indenture trustee. The settlement resolves representations and warranties claims, as well as substantially all historical servicing-related claims, including claims related to foreclosure delays and alleged mortgage documentation issues.

These trusts had an original principal balance of approximately $424 billion and total current unpaid principal balance of approximately $221 billion.

The 22 investors that have committed to support the settlement include many of the major U.S. and foreign institutional investors in RMBS:

- AEGON USA Investment Management LLC.
- Bayerische Landesbank.
- BlackRock Financial Management, Inc.
- Federal Home Loan Bank of Atlanta.
- The Federal Reserve Bank of New York's Maiden Lane entities.
- Goldman Sachs Asset Management L.P.
- ING Investment Management L.L.C.
- ING Bank fsb.
- ING Capital LLC.
- Invesco Advisers, Inc.
- Kore Advisors, L.P.
- Landesbank Baden-Wuerttemberg and LBBW Asset Management (Ireland) PLC, Dublin.
- Metropolitan Life Insurance Company.
- Nationwide Mutual Insurance Company and its affiliate companies.
- Neuberger Berman Europe Limited.
- New York Life Investment Management LLC.
- Pacific Investment Management Company LLC (PIMCO).
- Prudential Investment Management, Inc.
- Teachers Insurance and Annuity Association of America.
- Thrivent Financial for Lutherans.
- Trust Company of the West and its affiliated companies controlled by The TCW Group, Inc.
- Western Asset Management Company.

21.     On August 4, 2011, BofA filed a Form 10-Q with the SEC signed by defendant Cotty.

The Form 10-Q stated in relevant part:

In accordance with applicable accounting guidance, the Corporation establishes an accrued liability for litigation and regulatory matters when those matters present loss contingencies that are both probable and estimable. In such cases, there may be an exposure to loss in excess of any amounts accrued. When a loss contingency is not both probable and estimable, the Corporation does not establish an accrued liability. As a litigation or regulatory matter develops, the Corporation, in conjunction with any outside counsel handling the matter, evaluates on an ongoing basis whether such matter presents a loss contingency that is probable and estimable. If, at the time of evaluation, the loss contingency related to a litigation or regulatory matter is not both probable and estimable, the matter will continue to be

monitored for further developments that would make such loss contingency both probable and estimable. Once the loss contingency related to a litigation or regulatory matter is deemed to be both probable and estimable, the Corporation will establish an accrued liability with respect to such loss contingency and record a corresponding amount of litigation-related expense. The Corporation continues to monitor the matter for further developments that could affect the amount of the accrued liability that has been previously established. Excluding fees paid to external legal service providers, litigation-related expense was $2.3 billion and $3.2 billion during the three and six months ended June 30, 2011 compared to $102 million and $690 million for the same periods in 2010.

For a limited number of the matters disclosed in this Note, and in the prior commitments and contingencies disclosure, for which a loss is probable or reasonably possible in future periods, whether in excess of a related accrued liability or where there is no accrued liability, the Corporation is able to estimate a range of possible loss. In determining whether it is possible to provide an estimate of loss or range of possible loss, the Corporation reviews and evaluates its material litigation and regulatory matters on an ongoing basis, in conjunction with any outside counsel handling the matter, in light of potentially relevant factual and legal developments. These may include information learned through the discovery process, rulings on dispositive motions, settlement discussions, and other rulings by courts, arbitrators or others. In cases in which the Corporation possesses sufficient appropriate information to develop an estimate of loss or range of possible loss, that estimate is aggregated and disclosed below. There may be other disclosed matters for which a loss is probable or reasonably possible but such an estimate may not be possible. For those matters where an estimate is possible, management currently estimates the aggregate range of possible loss is $0 to $2.3 billion in excess of the accrued liability (if any) related to those matters. This estimated range of possible loss is based upon currently available information and is subject to significant judgment and a variety of assumptions, and known and unknown uncertainties. The matters underlying the estimated range will change from time to time, and actual results may vary significantly from the current estimate. Those matters for which an estimate is not possible are not included within this estimated range. Therefore, this estimated range of possible loss represents what the Corporation believes to be an estimate of possible loss only for certain matters meeting these criteria. It does not represent the Corporation's maximum loss exposure. Information is provided below, or in the prior commitments and contingencies disclosure, regarding the nature of all of these contingencies and, where specified, the amount of the claim associated with these loss contingencies. Based on current knowledge, management does not believe that loss contingencies arising from pending matters, including the matters described herein and in the prior commitments and contingencies disclosure, will have a material adverse effect on the consolidated financial position or liquidity of the Corporation. However, in light of the inherent uncertainties involved in these matters, some of which are beyond the Corporation's control, and the very large or indeterminate damages sought in some of these matters, an adverse outcome in one or more of these matters could be material to the Corporation's results of operations or cash flows for any particular reporting period.

*     *     *

**Mortgage-backed Securities Litigation**

The Corporation and its affiliates, Countrywide entities and their affiliates, and Merrill Lynch entities and their affiliates have been named as defendants in several cases relating to their various roles as issuer, originator, seller, depositor, sponsor, underwriter and/or controlling entity in MBS offerings, pursuant to which the MBS investors were entitled to a portion of the cash flow from the underlying pools of mortgages. These cases generally include purported class action suits and actions by individual MBS purchasers. Although the allegations vary by lawsuit, these cases generally allege that the registration statements, prospectuses and prospectus supplements for securities issued by securitization trusts contained material misrepresentations and omissions, in violation of Sections 11, 12 and 15 of the Securities Act of 1933, Sections 10(b) and 20 of the Securities Exchange Act of 1934 and/or state securities laws and other state statutory and common laws.

These cases generally involve allegations of false and misleading statements regarding: (i) the process by which the properties that served as collateral for the mortgage loans underlying the MBS were appraised; (ii) the percentage of equity that mortgage borrowers had in their homes; (iii) the borrowers' ability to repay their mortgage loans; and (iv) the underwriting practices by which those mortgage loans were originated (collectively MBS Claims). In addition, several of the cases discussed below assert claims related to the ratings given to the different tranches of MBS by rating agencies. Plaintiffs in these cases generally seek unspecified compensatory damages, unspecified costs and legal fees and, in some instances, seek rescission.

On May 24, 2011, Countrywide filed with the Judicial Panel on Multi-District Litigation a motion to centralize federal court cases involving Countrywide MBS Claims in the U.S. District Court for the Central District of California, which is pending.

*Luther Litigation and Related Actions*

On May 6, 2011, the court held, in *Maine State Retirement System vs. Countrywide Financial Corporation, et al.* (Maine State), that the plaintiffs only have standing to sue over the specific MBS tranches that they purchased, and that the applicable statute of limitations could be tolled by the filing of the *Luther v. Countrywide Financial Corporation, et al.* (Luther) action only with respect to the specific tranches of MBS that the Luther plaintiffs purchased. On June 6, 2011, the Maine State plaintiffs filed a third amended complaint that asserts claims in connection with nine MBS tranches and moved for certification of the case as a class action. On June 15, 2011, the court denied the Maine State plaintiffs' motion to permit immediate interlocutory appeal of the court's orders on standing, tolling of the statute of limitations, and successor liability.

On May 18, 2011, in Luther, the California Court of Appeal reversed the Superior Court's dismissal on jurisdictional grounds. Countrywide filed a petition for further review by the California Supreme Court.

*     *     *

*Merrill Lynch MBS Litigation*

On June 15, 2011, the court granted plaintiffs' motion for class certification.

22.    The August 4, 2011 10-Q contained certifications signed by defendants Moynihan and Thompson substantially identical to those quoted above.

## DEFENDANTS' STATEMENTS WERE FALSE AND MISLEADING

23.    Defendants' statements set forth above were materially false and misleading for failing to disclose that:

(a)    Between 2005 and 2007, BofA, Merrill Lynch, Countrywide and their subsidiaries sold AIG over $28 billion of RMBS;

(b)    As a result of those sales, AIG suffered losses of over $10 billion; and

(c)    BofA was potentially subject to suit for the recovery of those losses.

## THE TRUTH BEGINS TO COME TO LIGHT

24.    On August 8, 2011, AIG filed a complaint in New York state court against BofA and several of its subsidiaries. That complaint alleged "a massive fraud perpetrated by Defendants Bank of America, Merrill Lynch, and Countrywide that has resulted in more than $10 billion in damages to AIG." Specifically, AIG alleged as follows:

> Between 2005 and 2007, Defendants fraudulently induced AIG to invest in nearly 350 residential mortgage-backed securities ("RMBS") at a price of over $28 billion. Driven by a single-minded desire to increase their share of the lucrative RMBS market and the considerable fees generated by it, Defendants created and marketed RMBS backed by hundreds of thousands of defective mortgages.

> . . . The Offering Materials used to sell the RMBS fraudulently misrepresented and concealed the actual credit quality of the mortgages by providing false quantitative data about the loans, thus masking the true credit risk of AIG's

investments. The Offering Materials also falsely claimed that the mortgages had been issued pursuant to objective underwriting guidelines. In fact, the loan originators, including Defendants, encouraged borrowers to falsify loan applications, pressured property appraisers to inflate home values, and ignored obvious red flags in the underwriting process.

25.     As a result of this disclosure, the price of BofA's common stock dropped from a closing price of $8.17 per share on August 5, 2011 to a closing price of $6.51 per share on August 8, 2011, a decline of more than 20%. This decrease in the price of BofA common stock was a result of the artificial inflation caused by defendants' misleading statements coming out of the price.

26.     On August 8, 2011, *Reuters* reported "Bank of America Corp shares plunged more than 20 percent on Monday . . . . Monday's decline was triggered by a $10 billion lawsuit from American International Group Inc alleging a 'massive' mortgage fraud. The action raised new concerns about burgeoning losses related to the bank's $2.5 billion purchase of Countrywide Financial Corp in 2008 and prompted questions about the stability of the bank's management team."

## LOSS CAUSATION/ECONOMIC LOSS

27.     During the Class Period, as detailed herein, defendants made false and misleading statements and engaged in a scheme to deceive the market. This artificially inflated the price of BofA common stock and operated as a fraud or deceit on the Class. Later, when defendants' prior misrepresentations and fraudulent conduct became apparent to the market, the price of BofA common stock fell precipitously, as the prior artificial inflation came out of the price over time. As a result of their purchases of BofA common stock during the Class Period, plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## NO SAFE HARBOR

28.     BofA's verbal "Safe Harbor" warnings accompanying its oral forward-looking statements ("FLS") issued during the Class Period were ineffective to shield those statements from liability.

29.     The defendants are also liable for any false or misleading FLS pleaded because, at the time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was authorized and/or approved by an executive officer of BofA who knew that the FLS was false. None of the historic or present tense statements made by defendants were assumptions underlying or relating to any plan, projection or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by defendants expressly related to or stated to be dependent on those historic or present tense statements when made.

### APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET

30.     Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a)     Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)     The omissions and misrepresentations were material;

(c)     The Company stock traded in an efficient market;

(d)     The misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's stock; and

(e)     Plaintiff and other members of the Class purchased BofA common stock between the time defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

31.     At all relevant times, the market for BofA common stock was efficient for the following reasons, among others:

(a)     As a regulated issuer, BofA filed periodic public reports with the SEC; and

(b)      BofA regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts and other similar reporting services.

## CLASS ACTION ALLEGATIONS

32.      Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased the common stock of BofA during the Class Period (the "Class"). Excluded from the Class are defendants and their families, directors and officers of BofA and their families and affiliates.

33.      The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. BofA has more than 10 billion shares outstanding, owned by thousands of persons.

34.      There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a)      Whether the 1934 Act was violated by defendants;

(b)      Whether defendants omitted and/or misrepresented material facts;

(c)      Whether defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)      Whether defendants knew or recklessly disregarded that their statements were false and misleading;

(e)      Whether the price of BofA common stock was artificially inflated; and

(f)     The extent of damage sustained by Class members and the appropriate measure of damages.

35.     Plaintiff's claims are typical of those of the Class because plaintiff and the Class sustained damages from defendants' wrongful conduct.

36.     Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation.  Plaintiff has no interests which conflict with those of the Class.

37.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## COUNT I

### For Violation of §10(b) of the 1934 Act and Rule 10b-5 Against All Defendants

38.     Plaintiff incorporates ¶¶1-37 by reference.

39.     During the Class Period, defendants disseminated or approved the false statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

40.     Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

(a)     Employed devices, schemes, and artifices to defraud;

(b)     Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)      Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of BofA common stock during the Class Period.

41.      Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for BofA common stock.  Plaintiff and the Class would not have purchased BofA common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

42.      As a direct and proximate result of these defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their purchases of BofA common stock during the Class Period.

## COUNT II

### For Violation of §20(a) of the 1934 Act
### Against All Defendants

43.      Plaintiff incorporates ¶¶1-42 by reference.

44.      The Individual Defendants acted as controlling persons of BofA within the meaning of §20 of the 1934 Act.  By virtue of their positions and their power to control public statements about BofA, the Individual Defendants had the power and ability to control the actions of BofA and its employees.  BofA controlled the Individual Defendants and its other officers and employees.  By reason of such conduct, defendants are liable pursuant to §20(a) of the 1934 Act.

### PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for judgment as follows:

A.      Declaring this action to be a proper class action pursuant to Fed. R. Civ. P. 23;

B.      Awarding plaintiff and the members of the Class damages and interest;

- 19 -

C.   Awarding plaintiff's reasonable costs, including attorneys' fees; and

D.   Awarding such equitable/injunctive or other relief as the Court may deem just and

proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED:  September 23, 2011                ROBBINS GELLER RUDMAN
                                               & DOWD LLP
                                               SAMUEL H. RUDMAN

                                               SAMUEL H. RUDMAN

58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax

LAW OFFICES OF MARC S. HENZEL
MARC S. HENZEL
431 Montgomery Avenue, Suite B
Merion Station, PA  19066
Telephone:  610/660-8000
610/660-8080 (fax)

Attorneys for Plaintiff

CERTIFICATION OF NAMED PLAINTIFF
PURSUANT TO FEDERAL SECURITIES LAWS

DAVID LAWRENCE ("Plaintiff") declares:

1.   Plaintiff has reviewed a complaint and authorized its filing.

2.   Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.   Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.   Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action:

**Acquisitions:**

| Date Acquired | Number of Shares Acquired | Acquisition Price Per Share |
|---|---|---|
| 8-4-2011 | 34 | $ 9.09 |
| 4-18-2011 | 35 | $12.55 |
| | | |

**Sales:**

| Date Sold | Number of Shares Sold | Selling Price Per Share |
|---|---|---|
| | | |
| | | |
| | | |

5.   Plaintiff has not sought to serve or served as a representative party in a class action that was filed under the federal securities laws within the three-year period prior to the date of this Certification except as detailed below:

6.   The Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such

reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this _21st___ day of September, 2011.

_____

DAVID LAWRENCE

BANK OF AMERICA