UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DAVID LAWRENCE, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> vs. <br><br> BANK OF AMERICA COPORATION, BRIAN T. MOYNIHAN, CHARLES H. NOSKI, NEIL A. COTTY and BRUCE R. THOMPSON, <br><br> Defendants. | Civil Action No. 11-cv-6678 (JGK) <u>(ECF CASE)</u> <br><br><br> <u>DEMAND FOR JURY TRIAL</u> |

## **<u>AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS</u>**

010282-11  537320 V1

RECEIVED
2012 JUL 20  P 5: 25
U S DISTRICT COURT SDNY

## I.     INTRODUCTION

1.      Bank of America Corporation ("BAC") is one of the largest commercial banks in the United States.  Recently it has experienced significant financial problems, due, in large part, to enormous payments it has made to settle scores of lawsuits around the country related to its (and its acquired subsidiaries') issuance of hundreds of billions of dollars of mortgage-backed securities.  This action involves BAC's and its top officers' concealment from investors of a $10 billion claim by insurance giant American International Group ("AIG") that was known to the Defendants at all relevant times.

2.      As has been widely reported in the financial press, BAC, Countrywide Financial Corporation ("Countrywide") and Merrill Lynch & Co. ("Merrill Lynch") were each significantly involved in the excesses of the subprime mortgage boom of 2004-2008 as they originated, purchased, securitized and utilized mortgages as collateral for residential mortgage-backed securities ("RMBS").[1]  From 2004 through 2008, each of these entities underwrote increasingly risky loans such as interest-only mortgage loans and stated income or "liar loans" (loans with little or no income-supporting documentation requirement) to dramatically increase the number of loans available and enable them to issue more and more RMBS that they could then sell to investors.  As has now been confirmed by the Final Report of the National Commission on the Causes of the Financial and Economic Crisis in the United States that was issued by the Financial Crisis Inquiry Commission,[2] a large percentage of these loans did not comply with the underwriting standards touted in the offering materials associated with these RMBS.  Unaware that the collateral underlying these RMBS was far inferior to that promised by

---

[1] In 2008, BAC acquired Countrywide Financial Corporation ("Countrywide"), and in 2009 the Company acquired Merrill Lynch & Co. ("Merrill Lynch").

[2] The Financial Crisis Inquiry Commission was created as part of the Fraud Enforcement and Recovery Act (Public Law 111-21) passed by Congress and signed by the President in May 2009.

the offering materials, investors, including AIG, purchased hundreds of billions of dollars of these RMBS from Countrywide, Merrill Lynch and BAC.

3.      From 2007 to 2011, investors filed scores of lawsuits based on impaired RMBS as mortgage delinquencies skyrocketed from 1% prior to 2006 to nearly 10% in 2009.[3]  The collateral supporting the RMBS issued by many banks, including Countrywide, Merrill Lynch and BAC, was decimated, and the RMBS themselves suffered dramatic decreases in value. Thus, BAC faced extensive legal liability from its own actions, as well as those of Countrywide and Merrill Lynch, both of which BAC had acquired.[4]  BAC has paid tens of billions of dollars to settle such litigation, or to repurchase defective loans from investors.  To date, BAC has entered into settlements exceeding $17 billion to resolve claims of RMBS purchasers, insurers and trustees of RMBS offerings and purchasers (such as Freddie Mac and Fannie Mae) of loans from BAC, Countrywide and Merrill Lynch.

4.      One of the largest investors in RMBS issued by BAC, Merrill Lynch and Countrywide was AIG.  By at least early January 2011, BAC and its management were aware that AIG intended to file a massive lawsuit against BAC.  AIG, which had purchased more than $28 billion of RMBS from BAC and its subsidiaries Countrywide and Merrill Lynch, lost more than $10 billion as a result of these purchases.

5.      Undisclosed to the investing public, on January 13, 2011, BAC and AIG entered into a tolling agreement to keep the claims from expiring while the parties discussed a possible resolution of the proposed lawsuit.  As recently described in public filings, the tolling agreement was the product of extensive negotiation as it "tolled all time related defenses, including statutes

---

[3] *The Financial Crisis Inquiry Report*, Final Report of the National Commission on the Causes of the Financial and Economic Crisis in the United States (January 2011), p. 215 (the "FCIC Report").

[4] Likewise, BAC, Countrywide and Merrill Lynch have faced litigation or investigations by the Securities and Exchange Commission, the U.S. Senate, and the Financial Crisis Inquiry Commission.

of limitation or repose on all claims related to certain RMBS offerings" and contained an extensive and highly specific list of the RMBS offerings covered by the agreement. In February 2011, AIG sent a highly detailed analysis of its potential claims against BAC, including identifying exactly which RMBS were at issue, and evidence as to why AIG believed that BAC, Countrywide and Merrill Lynch had broken various laws in selling the RMBS to AIG and were therefore liable for AIG's damages.

6.     The Class Period commences on February 25, 2011, when BAC filed its annual report for the year ended 2010 with the Securities and Exchange Commission ("SEC") on Form 10-K. This annual report and the quarterly reports during the Class Period disclosed pages of contingent liabilities, including numerous lawsuits, *but failed to make any mention of the threatened AIG lawsuit, which was the most significant and largest potential litigation that could be asserted against the Company.* While AIG and BAC continued their discussions regarding resolving the potential claim, even attempting to mediate a resolution in July 2011, Defendants continued to hide the existence of the AIG loss contingency from investors in SEC filings and additional public disclosures. Defendants were well aware that the disclosure of this highly significant, costly litigation would have caused BAC's share price to plummet, which it did, when BAC eventually disclosed that AIG instituted litigation seeking $10 billion in damages.

7.     The Class Period ends on August 8, 2011, with the public announcement that AIG had filed its lawsuit against BAC – a 187 page highly detailed complaint with 349 exhibits detailing the misrepresentations in each one of the RMBS that AIG had purchased from BAC, Countrywide and Merrill Lynch. FORBES magazine described this evidence as "compelling." Investors were shocked at this giant and previously undisclosed loss contingency, causing BAC

shares to be "hammered" by more than 20% following the disclosure, on the heels of a 13.9%

decline in the two days prior to the official announcement of the litigation.

8.      Although it failed to do so, BAC was required by Generally Accepted Accounting

Principles ("GAAP") and SEC regulations to – at a minimum – disclose the existence of this loss

contingency in its annual and quarterly financial statements if:  (1) AIG had manifested its

awareness of a potential claim (it had); and (2) there was a *reasonable possibility* that the

outcome of the claim would be unfavorable for BAC (there was).  The fact that BAC and AIG

entered into a tolling agreement on January 13, 2011, is itself a manifestation of an awareness of

the claim by AIG.  In addition, a February AIG PowerPoint presentation to Defendants

discussing BAC's liabilities and the resulting damages incurred by AIG, the ongoing settlement

talks and the attempt at mediation adds to this evidence.  Likewise, given the scope of the

misconduct by BAC, Merrill Lynch (and especially) Countrywide, and BAC's litigation and

settlement of substantially similar litigation involving RMBS, there was certainly a reasonable

possibility that AIG's claim could have an unfavorable impact on BAC.

9.      Similarly, Regulation S-K required BAC to disclose any "uncertainties" that

could have a material impact on BAC's financial condition in the MD&A section of its 2010

Form 10-K.  In addition, the broad antifraud provisions of Section 10(b) of the Securities

Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder also

required BAC to inform investors of the AIG loss contingency.

10.     Despite these plain requirements to disclose loss contingencies, Defendants intentionally concealed the existence of this extremely large and material contingency from investors.  When the contingency was finally disclosed six months later, BAC shares were "hammered" as a direct result.  Thus, Plaintiffs and members of the Class suffered damages by paying an artificially inflated price for their purchased shares during the Class Period.

## II.     JURISDICTION AND VENUE

11.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§ 78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the SEC [17 C.F.R. § 240.10b-5].

12.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

13.     Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b).  Many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District.

14.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## III.     PARTIES

15.     Lead Plaintiff Camcorp Interests Limited ("Camcorp") was appointed Lead Plaintiff in this action by this Court's June 18, 2012 Order.  [Docket No. 53].  Lead Plaintiff Camcorp purchased shares of BAC in the open market during the Class Period on the dates and in the amounts set forth in its previously filed *Certification of Named Plaintiff Pursuant to Federal Securities Laws* [Docket No. 12-2], which is incorporated herein by reference.  Lead

Plaintiff Camcorp has been damaged as a result of these purchases in an amount to be determined at trial.

16.     Additional Plaintiff Alaska Electrical Pension Fund ("Alaska Electrical") purchased shares of BAC in the open market during the Class Period on the dates and in the amounts set forth in its previously filed *Certification of Named Plaintiff Pursuant to Federal Securities Laws* [Docket No. 9-2], which is incorporated herein by reference.  Plaintiff Alaska Electrical has been damaged as a result of these purchases in an amount to be determined at trial.

17.     Additional Plaintiff Northern Ireland Local Government Officers' Superannuation Committee ("NILGOSC") purchased shares of BAC in the open market during the Class Period on the dates and in the amounts set forth in its previously filed *Certification of Named Plaintiff Pursuant to Federal Securities Laws* [Docket No. 9-2], which is incorporated herein by reference Plaintiff NILGOSC has been damaged as a result of these purchases in an amount to be determined at trial.

18.     Defendant Bank of America Corporation ("BAC" or the "Company") is incorporated under the laws of Delaware and headquartered in Charlotte, North Carolina.  The Company's shares trade on the New York Stock Exchange under the ticker symbol "BAC."  As of February 17, 2012, BAC had approximately 10.7 billion shares of common stock outstanding. BAC claims a "headquarters" of Charlotte, North Carolina, but lists among its "principal offices" a 54 story office building at One Bryant Park, New York, NY, within this judicial district.

19.     The following officers and directors of BAC (the "Individual Defendants") are also defendants in this action:

(a)     Defendant Brian T. Moynihan ("Moynihan") has been President, Chief Executive Officer ("CEO") and a member of the Board of Directors of BAC since January 2010,

- 6 -

and held various positions in the Company prior to his current positions since at least April 2004. Moynihan, an attorney, was General Counsel of BAC from October 2008 through January 2009, and CEO of Merrill Lynch following its acquisition by BAC in 2009, prior to becoming CEO of BAC.

(b)     Defendant Charles H. Noski ("Noski") joined Bank of America as executive vice president and Chief Financial Officer ("CFO") in May 2010, and acted in that role until June 2011, when he relinquished his role as CFO and became vice chairman of BAC.

(c)     Defendant Neil A. Cotty ("Cotty") was, at all times relevant to this action, the Chief Accounting Officer and Principal Accounting Officer of BAC.

(d)     Defendant Bruce R. Thompson ("Thompson") has been CFO of the Company since June 2011.  Prior to that date, he held various positions at the Company since at least 2006, including as Chief Risk Officer from January 2010 to June 2011.

20.     During the Class Period, the Individual Defendants, as senior executive officers and/or directors of BAC, were privy to confidential and proprietary information concerning BAC, its operations, finances, financial condition, present and future business prospects, and the status of pending and potential litigation against the Company.  The Individual Defendants also had access to material adverse non-public information concerning BAC, as discussed in detail below.  Because of their positions with BAC, the Individual Defendants had access to non-public information about its business, finances, products, markets, present and future business prospects, and the status of pending and potential litigation against the Company *via* internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or board of directors meetings and committees thereof and *via* reports and other information provided to them in connection therewith.  Because

of their possession of such information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

21.     The Individual Defendants are liable as direct participants in the wrongs complained of herein.  In addition, the Individual Defendants, by reason of their status as senior executive officers and/or directors, were "controlling persons" within the meaning of Section 20(a) of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein.  Because of their positions of control, the Individual Defendants were able to and did, directly or indirectly, control the conduct of BAC's business.

22.     The Individual Defendants, because of their positions with the Company, controlled and/or possessed the authority to control the contents of its reports, press releases and presentations to securities analysts and through them, to the investing public.  The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading, prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Thus, the Individual Defendants had the opportunity to commit the fraudulent acts alleged herein.

23.     As senior executive officers and/or directors and as controlling persons of a publicly traded company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, and whose securities were traded on, *inter alia*, the New York Stock Exchange and governed by the federal securities laws, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with respect to BAC's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings and present and future business prospects, and to correct any previously

- 8 -

issued statements that had become materially misleading or untrue, so that the market price of

BAC's securities would be based upon truthful and accurate information.  The Individual

Defendants' misrepresentations and omissions during the Class Period violated these specific

requirements and obligations.

24.     The Individual Defendants are liable as participants in a fraudulent scheme and

course of conduct that operated as a fraud or deceit on purchasers of BAC's securities by

disseminating materially false and misleading statements and/or concealing material adverse

facts.  The scheme:  (i) deceived the investing public regarding BAC's liabilities and prospects

and the intrinsic value of BAC's securities; and (ii) caused Plaintiffs and members of the Class to

purchase BAC securities at artificially inflated prices.

## IV.     BACKGROUND INFORMATION

25.     AIG purchased more than $28 billion of RMBS from BAC, Countrywide and

Merrill Lynch.  These RMBS were of the same nature, and their sales purportedly involved the

same misconduct, as other RMBS sales for which many of the country's banks, including BAC,

have already paid billions of dollars in settlements to investors for having caused their losses.

Countrywide was acquired by BAC in 2008 and, in January 2009, BAC completed its acquisition

of Merrill Lynch.

## A.     Securitization of Mortgage Loans

26.     Traditionally, the model for a mortgage loan involved a bank extending a loan to

a home owner in exchange for a promissory note from the home owner to repay the principal

plus interest.  The bank held a lien against the house as collateral in the event that the owner

defaulted on the obligation.  The bank held the loan until it matured and was subject to the risk of

nonpayment by the owner.  Under this simple model, the bank had a financial incentive to ensure

that the owner had the financial ability to repay the note, and that the underlying collateral had sufficient value to fully secure the bank against any default.

27.     Beginning in the 1990s, banks and other lenders introduced financial "innovations" in the form of asset securitization to finance an expanding mortgage market.  In a securitization, large numbers of mortgage loans are sold to the issuer and pooled together as one large "pool" of collateral underlying bonds that are then sold to investors.  Unlike the simple lending model described above, the loan originator is no longer subject to the risk that the owner may default – this risk is sold along with the mortgage loans to the issuer of the bonds.

28.     During the 1990's, most mortgage securitizations were conducted by the Federal National Mortgage Association ("Fannie Mae"), the Federal Home Loan Mortgage Corporation ("Freddie Mac") and the Government National Mortgage Association ("Ginnie Mae") (collectively, the "Agencies").  The Agencies purchased loans from originators and securitized the loans.  These "Agency" securitizations had high credit quality because each of the Agencies required the underlying loans to be underwritten in conformance with strict underwriting guidelines.  Loans that conform to the strict Agency underwriting guidelines are said to be "conforming" loans.

29.     In the 2000's, the volume of non-Agency mortgage loan securitizations skyrocketed, led by Wall Street firms such as Merrill Lynch, large banks such as BAC, and a new crop of "mortgage lenders" such as Countrywide that were neither banks nor investment banks, but a new breed of retailer that specialized in mass-marketing and the mass-production of mortgages to the general public.  The fees that could be earned by securitizing loans dwarfed the profitability of the "originate to hold" banking model that had existed prior to the 1990's, and these "originate to distribute" business models began to flourish.

30.     This fundamental change in the home mortgage market directly led to the near-collapse of the U.S. banking system in 2008.  Whereas the profitability of banks operating under the old "originate and hold" model depended upon making only high quality loans (because the banks retained them until maturity), the securitization or "originate to distribute" model turned these principles on their head.  Instead of being rewarded for conservative and safe lending practices, securitizers such as Countrywide, BAC and Merrill Lynch made profits based entirely upon the level of bonds they were able to issue.  Because the only constraining factor of profits under this model is the ability to generate enough mortgages to securitize the bonds, the incentives essentially flipped, to these "lenders" being rewarded for generating more – rather than better – loans.  If the loans went bad, they would be someone else's (the buyer of the bonds) problem.  Within a 20-year period, the mortgage market in the U.S. had transformed from banks carefully making high-quality loans which they retained possession of, into high-volume, no-risk proposition for lenders that rewarded volume over quality.

31.     The alleged "protections" for bond purchasers were underwriting policies disclosed in each securitization prospectus that the issuer contractually agreed to follow.  These underwriting policies generally include (1) maximum loan-to-value ratios used to qualify borrowers based upon competent appraisals; (2) a maximum debt-to-income ratio; (3) minimum credit or FICO scores; and (4) a thorough background check including income verification.  A further "protection" for the bond purchasers was the assurance that the bonds were rated "AAA" or the equivalent by a national ratings agency.  As investors would learn the hard way, these protections were woefully insufficient, and the ability of unscrupulous issuers like Countrywide, BAC and Merrill Lynch to bypass these protections led to massive losses for AIG and other investors, and nearly caused the collapse of the country's banking system.  With issuers able to

- 11 -

manipulate and falsify the stated underwriting policies, and profits based entirely on the volume of loans underwritten rather than their quality, it was a "race to the bottom" to see who could generate the most loans without regard to loan quality or whether the borrower could ever repay the loan.

**B.    BAC Was Aware Prior to the Class Period that Litigation Brought By AIG Was At Least "Reasonably Possible" to Result in an Unfavorable Outcome for BAC**

32.    BAC was well aware that it faced significant liability from its own actions, as well as from misconduct at both its Countywide and Merrill Lynch subsidiaries both before and after the acquisitions of those two deeply troubled entities.

**1.    Litigation regarding Countrywide RMBS was at least "reasonably possible" to result in an unfavorable outcome to BAC.**

33.    Prior to the Class Period, BAC was well aware that any litigation brought against it by AIG was at least reasonably possible to succeed because:  a) Countrywide had drastically and covertly changed its business model in 2003 to become a risky subprime lender; b) Countrywide's RMBS offering memoranda contained numerous misrepresentations about Countrywide's loan underwriting process and standards; c) BAC was aware of the scope of Countrywide's legal problems in this regard, having performed "extensive" due diligence into potential lawsuits prior to acquiring the company; and d) a tidal wave of litigation and governmental investigations against Countrywide confirmed the legitimacy of AIG's allegations.

**a.    Countrywide becomes a high-risk lender.**

34.    Until 2003, Countrywide primarily made traditional first-lien home mortgage loans to individuals with strong credit histories.  Such "conforming" mortgage loans are generally safe for lenders, and are regularly sold to Fannie Mae and Freddie Mac, the Agencies that provide liquidity to the home mortgage market.  In May 2003, a "culture change" was

implemented at Countrywide designed to increase Countrywide's market share of 13% to an enormous and unprecedented 30% share of all mortgage loans in the United States.

35.     Countrywide expanded its pool of borrowers in order to increase its loan volumes and profitability, since the Company charged higher fees to riskier borrowers, and because it generated substantial income from reselling the mortgage loans as mortgage-backed securities. Countrywide's aggressive underwriting was fueled by its ambitious quest for market share.  In its zeal to retain and increase market share, Countrywide opted to match its competitors' loan products even when those products were unduly risky.

36.     Starting in 2004 and accelerating in 2005, Countrywide expanded its origination of riskier lines of products, including interest-only mortgage loans and stated income or "liar loans."  In 2001, 50 percent of Countrywide's mortgage loans were prime conforming mortgage loans; by 2006, that percentage had declined to 31.9 percent.  Conversely, the percentage of non-conforming mortgage loans originated by Countrywide increased from 16.5 percent to 45.2 percent during the same period.

> **b.     Countrywide's RMBS offering memoranda contained numerous misstatements and omissions.**

37.     Although Countrywide had shifted its business model to underwrite a large volume of risky and speculative loans, it continued to represent its loan underwriting practices as conservative to unsuspecting investors.  The offering documents used by Countrywide to sell their RMBS to unsuspecting investors contained untrue statements of material fact, or omitted to state material facts necessary to make the statements therein not misleading, regarding:  (1) the underwriting standards purportedly used in connection with the origination of the underlying mortgages; (2) the maximum loan-to-value ratios used to qualify borrowers; (3) the appraisals of

the properties underlying the mortgages; (4) the debt-to-income ratios permitted on the loans; and (5) the ratings of the RMBS by various rating agencies.

### c.   BAC performed extensive due diligence on the legal liabilities of Countrywide prior to acquiring the company.

38.   On January 11, 2008, BAC announced that it would purchase Countrywide Financial for approximately $4.1 billion.

39.   On January 22, 2008, the LOS ANGELES TIMES reported that BAC had been examining the books of Countrywide since the previous summer, and beginning in December 2007, had sent a team of 60 employees to sift through Countrywide's operations and potential legal liabilities.[5]  Based on this massive "due diligence" effort, BAC had been satisfied that it would "come out ahead, *even after billions of dollars in charges for loan losses and lawsuits*." (Emphasis added.)

40.   On January 23, 2008, the NEW YORK TIMES reported that BAC's CEO (at that time) Kenneth Lewis confirmed that BAC had done "extensive due diligence" into Countrywide before closing the acquisition:[6]

> 'We did extensive due diligence.  We had 60 people inside the company for almost a month.  It was the most extensive due diligence we have ever done.  So we feel comfortable with the valuation,' Mr. Lewis said.  'We looked at every aspect of the deal, from their assets *to potential lawsuits* and we think we have a price that is a good price.'  (Emphasis added.)

---

[5] *Mortgages; Lender is good bet, says BofA*, LOS ANGELES TIMES (January 22, 2008), p. C1.

[6] *Bank of America Joins Parade of Mortgage-Related Losses*, the NEW YORK TIMES (January 23, 2008), p. C1.

          **d.**     **The wave of litigation and governmental investigations against Countrywide confirms BAC's potential liability.**

41.      As a result of its acquisition of Countrywide in 2008, BAC has been forced to pay billions of dollars in settlement of claims similar in nature to AIG's claims regarding its purchases of Countrywide RMBS.  On June 30, 2012, the WALL STREET JOURNAL reported that the massive levels of legal liabilities from Countrywide have cost BAC $40 billion to date, causing one finance professor to term the Countrywide acquisition as "the worst deal in the history of American finance."[7]  And there are many billions of dollars of potential litigation still awaiting trial or settlement.

42.      On June 4, 2009, the SEC filed a civil complaint against former Countrywide executives alleging that they deliberately misled investors by "falsely assuring investors that Countrywide was primarily a prime quality mortgage lender that had avoided the excesses of its competitors."[8]  On October 15, 2010, the SEC announced that Countrywide's former CEO had agreed to pay a "record" $22.5 million civil penalty to settle these charges – the largest ever paid by a public company's senior executive in an SEC settlement."[9]

43.      Likewise, BAC was forced to pay billions of dollars in settlement of litigation asserting similar claims to those contemplated by AIG prior to and during the Class Period.  For example, BAC paid the following $17.7 billion in settlement of litigation alleging that Countrywide had violated its disclosed underwriting standards for mortgages:

---

[7] Fitzpatrick, *BofA's Blunder: $40 Billion-Plus*, the WALL STREET JOURNAL (June 30, 2012), p. B1.

[8] *SEC Files Securities Fraud Charges Against Former Countrywide Executives*, SEC Litigation Release No. 21068A, Accounting and Auditing Enforcement Release No. 3023 (June 4, 2009). http://www.sec.gov/litigation/litreleases/2009/lr21068a.htm.

[9] *Former Countrywide CEO Angelo Mozilo to Pay SEC's Largest-Ever Financial Penalty Against a Public Company's Senior Executive*, SEC Press Release 2010-197 (October 15, 2010). http://www.sec.gov/news/press/2010/2010-197.htm.

- On May 17, 2010, BAC settled a lawsuit brought against Countrywide by its shareholders alleging that Countrywide failed to disclose certain loan underwriting policies to shareholders, creating an unnecessary risk for investors.  BAC paid $600 million to settle this litigation.[10]

- On November 15, 2010, BAC settled litigation brought against Countrywide regarding misrepresentations in its RMBS offering memoranda by the New Mexico State Investment Council, New Mexico Educational Retirement Board and New Mexico Public Employees Retirement Association for $162 million;

- On January 3, 2011, BAC announced in a press release that it had agreed "to resolve repurchase claims" with Fannie Mae and Freddie Mac over loans originated and sold to them by Countrywide that were in violation of claimed underwriting standards.  This settlement was for $3 billion;

- On April 15, 2011, BAC announced that it had settled claims asserted by Assured Guaranty, Ltd. related to RMBS transactions insured by Assured Guaranty, including claims relating to reimbursement for breaches of representations and warranties.  The settlement was for $1.1 billion;

- On June 29, 2011, BAC announced that it had settled litigation brought by the Bank of New York Mellon as trustee of various RMBS issued by Countrywide for $8.5 billion.  Subsequent court filings in that case detailed that settlement discussions had been commenced by November, 2010; and

- Also on June 29, 2011, BAC announced that it would be forced to pay an additional $5.5 billion to Fannie Mae and Freddie Mac to settle repurchase claims related to loans sold to these entities in violation of stated underwriting policies.

44.     Following the conclusion of the Class Period, BAC announced yet another settlement of litigation related to its falsely stated underwriting practices:

- On July 17, 2012, BAC settled litigation brought by Syncora Guarantee for $375 million.  The lawsuit alleged that a "significant percentage" of the mortgage loans securitizing the RMBS did not comply with Countrywide's representations and warranties regarding the loans.

45.     BAC continues to face significant liability from currently pending litigation regarding Countrywide RMBS, much of which has already withstood motions to dismiss and other legal challenges, including the following:

---

[10] *In re Countrywide Fin. Corp. Sec. Litig.*, No. 07-5295 (C.D. Cal.)

- A multidistrict litigation currently pending in the U.S. District Court for the Central District of California in which numerous lawsuits have been consolidated, including lawsuits filed by:

  o A class action of all purchasers of certain RMBS issued by Countrywide during the Class Period;

  o Sealink Funding Limited regarding purchases in 31 RMBS offerings issued and/or underwritten by Countrywide entities between 2005 and 2007;

  o The Federal Housing Finance Agency, on behalf of FNMA and FHLMC related to purchases of RMBS issued by CFC-related entities in 86 RMBS offerings between 2005 and 2008;

  o The FDIC, as receiver for United Western Bank, related to various purchases of Countrywide RMBS;

  o Allstate insurance company related to its purchase of $700 million of Countrywide RMBS; and

  o Dexia Holdings, Inc. related to purchases of RMBS issued by CFC-related entities in 142 RMBS offerings and six private placements between April 2004 and August 2007.

- Litigation brought by RMBS insurers MBIA, Financial Guarantee Insurance Company and Ambac Assurance;

- Litigation brought by U.S. Bancorp, as trustee for various RMBS.

46.     These settlements, both prior to and during the Class Period, as well as numerous additional lawsuits that had survived motions to dismiss confirm that BAC was aware that it was "reasonably possible" that AIG's litigation would result in an unfavorable outcome for BAC.

**2.     AIG's claims regarding Merrill Lynch RMBS were also at least "reasonably possible" to result in an unfavorable outcome for BAC.**

47.     Likewise, BAC was aware prior to the Class Period that AIG's claims regarding its losses from purchases of Merrill Lynch RMBS were also "reasonably possible" to result in an unfavorable outcome for BAC.

48.     The Merrill Lynch RMBS purchased by AIG and other investors were supported by pools of mortgage loans that Merrill Lynch acquired from various mortgage originators, including, among others, Countrywide Home Loans, Inc., Ownit Mortgage Solutions, Inc. ("Ownit"), New Century Mortgage Corporation ("New Century"), IndyMac Bank, F.S.B. ("IndyMac"), WMC Mortgage Corporation ("WMC"), ResMAE Mortgage Corporation ("ResMAE") and Fremont Investment & Loan ("Fremont").  Many of these loan originators had completely abandoned their claimed underwriting standards, and were making risky loans that did not comply with the underwriting standards contained in Merrill Lynch's offering memoranda related to its RMBS.

49.     Merrill Lynch's deviation from disclosed underwriting standards was confirmed by the final report of the Financial Crisis Inquiry Commission.  According to this report, Merrill Lynch subcontracted certain of its due diligence investigations regarding the loans included in the RMBS to Clayton Holdings, Inc., a third-party specialist in due diligence of mortgage underwriting.[11]  From January 2006 through June 2007, Clayton rejected 23% of the loans proposed by Merrill Lynch as not being in compliance with the stated underwriting guidelines.

50.     Like Countywide, Merrill Lynch had also been the target of a wave of litigation and governmental investigations regarding its RMBS.  In fact, shortly after the Class Period, Merrill Lynch settled a class action related to misrepresentations in the offering materials for certain of its RMBS for $315 million, which was the largest settlement of RMBS claims by any financial institution.[12]  The lawsuit was originally filed on December 12, 2008, and alleged improprieties in connection with mortgage pass-through certificates and mortgage-backed

---

[11] FCIC Report, p. 167.

[12] Order, *Public Employees' Retirement System of Mississippi v. Merrill Lynch & Co., Inc.*, No. 1:08-cv-10841-JSR-JLC (S.D.N.Y.) (Oct. 26, 2011) [Docket No. 172].

securities of the same type that AIG alleged in its litigation.  The court had denied motions to

dismiss these claims in March 2010, and had certified a class in June 2011.  The fact that this

class action had survived Merrill Lynch's motion to dismiss prior to the Class Period

demonstrates BAC's knowledge that its liability to AIG for similar claims was – at a minimum –

"reasonably possible."

51.     Merrill Lynch continues to face additional litigation regarding its RMBS

offerings, including litigation from various Federal Home Loan Bank Boards, the Federal

Housing Finance Agency and private litigants.

> **3.     AIG's claims regarding Bank of America RMBS were also at least
> "reasonably possible" to result in an unfavorable outcome for BAC.**

52.     Bank of America also disregarded its stated underwriting guidelines on its own

securitized loans.  In 2005, examiners from the Federal Reserve conducted a study of mortgage

practices at six large banks, including Bank of America.  The study "showed a very rapid

increase in the volume of these irresponsible loans, very risky loans."[13]

53.     BAC and the Individual Defendants were well aware of BAC's change in

underwriting standards, and the fact that such an undisclosed change in underwriting standards

was more than "reasonably possible" to create liability to AIG.

**C.     Defendants Were Aware That AIG Had Manifested its Awareness of Potential
Claims against BAC Prior to the Start of the Class Period**

The conduct of both AIG and BAC prior to the Class Period conclusively demonstrates

that AIG had manifested its awareness of the potential claim prior to the Class Period.

---

[13] FCIC Report, p. 172.

- 19 -

1.      **The January 13, 2011 Tolling Agreement.**

54.      On January 13, 2011, BAC entered into an agreement (the "Tolling Agreement") tolling all time-related defenses, including statutes of limitations or repose, on all claims related to certain RMBS offerings.[14]  Tolling agreements are often made in the course of settlement negotiations to allow time for the sharing of information in furtherance of reaching a settlement. *See*, *e.g.*, SEC Enforcement Manual at 39.  Accordingly, they are a clear manifestation by a potential claimant of its awareness of a possible claim.

55.      The Tolling Agreement was highly specific, identifying exactly which bonds were at issue in the planned litigation, listing each of the different RMBS that AIG planned to include in the litigation.

56.      As correspondence later included as an exhibit to a sworn declaration in court filings demonstrates, AIG's counsel had the understanding that BAC knew that AIG planned to sue it *by at least the date of this standstill agreement*:[15]

> It is our understanding that BoA, Merrill Lynch and First Franklin have known since at least January 2011, when a standstill agreement was signed, that Quinn Emanuel was actively developing RMBS-related claims against them.

---

[14] *See* Notice of Motion and Motion to Dismiss; Memorandum of Points and Authorities in Support Thereof, *American Int'l Group, Inc. v. Bank of America Corp.*, No. 2:11-cv-10549-MRP (MANx), filed February 27, 2012, p. 3 n.4 & Exhibit A [Docket No. 102]; and Memorandum of Points and Authorities in Opposition to Countrywide's Motion to Dismiss, *American Int'l Group, Inc. v. Bank of America Corp.*, No. 2:11-cv-10549-MRP (MANx), filed Apr. 23, 2012, p. 4. [Docket No. 122].

[15] Letter from Gregory P. Joseph to Joseph J. Ybarra dated September 26, 2011 (the "September 26, 2011 Letter").  This letter was attached as Exhibit F to the Declaration of Marc T.G. Dworsky in Support of Defendants' Motion to Disqualify Quinn Emanuel Urquhart & Sullivan, LLP as Counsel for Plaintiffs, *American Int'l Group v. Bank of America Corp.*, No. 11:cv-06212-BSJ (S.D.N.Y.) [Docket No. 42-6], p. 4.

**2.      AIG provides BAC with a detailed description of its planned litigation.**

57.      BAC's interaction with AIG did not cease with the execution of the Tolling

Agreement.  Rather, discussions and presentations about the merits of the AIG claims continued

throughout the Class Period.  For example, in February 2011, AIG's counsel sent a detailed

PowerPoint presentation to counsel for BAC outlining the specific claims that AIG planned to

bring against BAC.  According to AIG's counsel, this "extensive" PowerPoint presentation that

"outlined AIG's putative $10 billion in claims."[16]

**3.      AIG and BAC mediate the AIG claims.**

58.      In July 2011, unbeknownst to investors, AIG and BAC participated in a mediation

in an attempt to resolve the AIG claims.[17]  The mediation concluded without resolving AIG's

$10 billion in claims, further increasing the likelihood at that point in time that an action would

be commenced by AIG.

**4.      BAC retains litigation counsel for the AIG litigation.**

59.      On July 19, 2011, BAC retained Munger Tolles & Olson LLP ("MTO") to defend

it against the AIG litigation.[18]  By July 25, 2011, MTO had been communicating with AIG's

litigation counsel about the case.[19]

60.      Even though BAC knew that a lawsuit from AIG was at least reasonably possible

to lead to an adverse outcome, it steadfastly refused to disclose the existence of this known

---

[16] *Id.*

[17] *Id.*

[18] Declaration of Marc T.G. Dworsky in Support of Defendants' Motion to Disqualify Quinn Emanuel Urquhart & Sullivan, LLP as Counsel for Plaintiffs, *American Int'l Group v. Bank of America Corp.*, No. 11:cv-06212-BSJ (S.D.N.Y.) [Docket No. 42], ¶ 10.

[19] Declaration of Michael B. Carlinsky, *American Int'l Group v. Bank of America Corp.*, No. 11:cv-06212-BSJ (S.D.N.Y.) [Docket No. 56], ¶ 28.

contingency to investors, as described below, despite the requirements of the federal securities laws, SEC Regulations and GAAP.

## V.    FALSE AND MISLEADING STATEMENTS DURING THE CLASS PERIOD

61.    On February 24, 2011, the last day prior to the beginning of the Class Period, BAC shares closed trading at $13.87 per share.

### A.    The 2010 Form 10-K

62.    On February 25, 2011, BAC filed its annual report on Form 10-K with the SEC (the "2010 Form 10-K").[20]  This filing was signed by Defendants Moynihan, Noski and Cotty in their capacities as Chief Executive Officer, Chief Financial Officer (Principal Financial Officer) and Chief Accounting Officer (Principal Accounting Officer).  This Form 10-K (pages 196-205) disclosed the existence of significant amounts of loss contingencies related to other claims or potential claims against the Company, but failed to identify the massive claims asserted by AIG that were the subject of negotiations and a tolling agreement executed by BAC on January 13, 2011, *even though the AIG claim was probably the largest single potential loss from litigation and was certainly material to the Company's reported financial position*.

63.    Accordingly, this disclosure was materially false and misleading in that it materially understated BAC's loss contingencies related to litigation, and failed to identify the single largest potential legal liability of BAC, even though the Company and the Individual Defendants were aware that there was more than a reasonable possibility that the litigation would result in a loss for the Company.  In addition to rendering this portion of the 2010 Form 10-K materially false and misleading, the failure to disclose this AIG loss contingency also violated

---

[20] Bank of America Corporation, 2010 Annual Report (Form 10-K), February 25, 2011.

SEC Regulations S-K, as described below, and caused BAC's financial statements to violate

SEC Regulation S-X and GAAP, as also described below.

      64.    Page 112 of the 2010 Form 10-K disclosed BAC's policy for disclosure of loss

contingencies such as the massive AIG litigation:

> **Litigation Reserve**
>
> In accordance with applicable accounting guidance, the
> Corporation establishes an accrued liability for litigation and
> regulatory matters when those matters present loss contingencies
> that are both probable and estimable.
>
>                      \*     \*     \*
>
> If, at the time of evaluation, the loss contingency related to a
> litigation or regulatory matter is not both probable and estimable,
> the matter will continue to be monitored for further developments
> that would make such loss contingency both probable and
> estimable.  Once the loss contingency related to a litigation or
> regulatory matter is deemed to be both probable and estimable, the
> Corporation will establish an accrued liability with respect to such
> loss contingency and record a corresponding amount of litigation-
> related expense.  The Corporation will continue to monitor the
> matter for further developments that could affect the amount of the
> accrued liability that has been previously established.
>
> For a limited number of the matters disclosed in *Note 14 –
> Commitments and Contingencies* to the Consolidated Financial
> Statements for which a loss is probable or reasonably possible in
> future periods, whether in excess of a related accrued liability or
> where there is no accrued liability, we are able to estimate a range
> of possible loss.  In determining whether it is possible to provide
> an estimate of loss or range of possible loss, the Corporation
> reviews and evaluates its material litigation and regulatory matters
> on an ongoing basis, in conjunction with any outside counsel
> handling the matter, in light of potentially relevant factual and
> legal developments.  These may include information learned
> through the discovery process, rulings on dispositive motions,
> settlement discussions, and other rulings by courts, arbitrators or
> others.  In cases in which the Corporation possesses sufficient
> information to develop an estimate of loss or range of possible
> loss, that estimate is aggregated and disclosed in *Note 14 –
> Commitments and Contingencies* to the Consolidated Financial
> Statements.  For other disclosed matters for which a loss is

> probable or reasonably possible, such an estimate is not possible.
> Those matters for which an estimate is not possible are not
> included within this estimated range.  Therefore, the estimated
> range of possible loss represents what we believe to be an estimate
> of possible loss only for certain matters meeting these criteria.

This disclosure was materially false and misleading because it failed to inform the reader that BAC was not following the "applicable accounting guidance," as detailed below, which would have – at a minimum – required BAC to disclose the AIG loss contingency in the body of the Form 10-K and Form 10-Q's, as well as in the notes to the financial statements of each.

65.     "Note 14 – Commitments and Contingencies" of the 2010 Form 10-K disclosed a wide variety of "Litigation and Regulatory Matters" involving the Company.[21]  This provision was materially false and misleading in that it failed to disclose the existence of the AIG potential litigation, even though it was the most important, material and relevant litigation, and would have been important to any investor.  In fact, Defendants failed to disclose this litigation precisely *because* it was the most relevant, material and important litigation, in full knowledge that the disclosure of this shocking contingency would cause BAC shares to plummet.

66.     The 2010 Form 10-K also disclosed that BAC's financial statements were prepared "in conformity with accounting principles generally accepted in the United States of America (GAAP)."[22]  This disclosure was materially false and misleading when made because BAC violated GAAP in the presentation of its financial statements by failing to accrue or disclose the $10 billion loss contingency related to AIG's planned litigation.  Pursuant to GAAP, and specifically ASC 450 (as described in more detail below), a loss contingency *must* be disclosed if it is reasonably possible that the outcome will be unfavorable.  Any reasonable company officer would be reckless in not recognizing that an unfavorable outcome was at least

---

[21] *See* Bank of America Corporation 2010 Annual Report (Form 10-K) at 196-205 (Feb. 25, 2011).

[22] 2010 From 10-K, p. 142.

"reasonably possible" in light of the gross misconduct of BAC and the waves of similar litigation that had already been settled by BAC for many billions of dollars for similar claims.   The failure to even provide a footnote disclosure of this AIG loss contingency thus violated GAAP and SEC regulations.

67.      In addition, Defendant Moynihan signed certifications pursuant to Section 302 and 906 of the Sarbanes-Oxley Act of 2002 representing that the 2010 Form 10-K did not contain any untrue statements or material omissions and that he had personally overseen BAC's system of internal controls, which were designed to ensure that all material financial results and contingencies were brought to his attention:

> I, Brian T. Moynihan, certify that:
>
> 1.      I have reviewed this Annual Report on Form 10-K of Bank of America Corporation;
>
> 2.      Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;
>
> 3.      Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;
>
> 4.      The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:
>
> a)      Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made

010282-11  537320 V1

known to us by others within those entities, particularly during the period in which this report is being prepared;

b)      Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c)      Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d)      Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.      The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a)      All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b)      Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Defendant Noski signed a similar certification in his capacity as CFO of BAC.

68.     Likewise, Defendants Moynihan and Noski each signed certifications pursuant to Section 906 of Sarbanes-Oxley (18 U.S.C. § 1350) representing that the 2010 Form 10-K "fairly presents, in all material respects, the financial condition and results of operations of the Registrant as of, and for, the periods presented."

69.     The 2010 Form 10-K disclosed that BAC had a reported net loss of $2.2 billion in 2010, and a reported net income of $6.3 million in 2009 and $4.0 million in 2008.[23]  A $10 billion loss contingency is unquestionably material to the financial results of BAC.

70.     On April 15, 2011, BAC issued an earnings release for the first quarter of 2011, and held a conference call to discuss these results.  During the conference call, Defendant Noski discussed various legal liabilities confronting BAC related to its RMBS, but failed to disclose the looming $10 billion claim of AIG:

> On that note, as Brian made reference to this morning, we announced an agreement with Assured Guaranty to resolve all of the monoline's outstanding and potential repurchase claims related to alleged reps and warranties breaches involving certain first and second lien residential mortgage-backed secure trusts or Assured provided financial guaranty insurance.  The agreement covers combined original collateral exposure of approximately $35.8 billion with a combined principal at risk of approximately $10.9 billion.
>
> The agreement includes a cash payment of approximately $1.1 billion to Assured as well as a loss sharing reinsurance arrangement that has a current estimated fair market value of approximately $500 million.  Approximately $1.1 billion of that was reserved for these potential repurchase claims at the end of December with the remaining liability recognized in the first quarter.
>
> This settlement gets behind us a sizable piece of home equity exposure along with some first lien exposure.  We currently estimate the upper end of the possible loss range related to non-GSEs to remain at around $7 billion to $10 billion over existing

---

[23] 2010 Form 10-K, p. 137.

accruals.  Any reduction in our previously disclosed estimated range resulting from reserve accruals in this quarter were largely offset by the impact of HPI deterioration during the first quarter.

As a reminder, this estimated range does not represent our estimate of a probable loss and is based on current assumptions that are necessarily subject to change.  The liability for reps and warranties ended the quarter at $6.2 billion compared to $5.4 billion in the prior quarter.

Our unresolved repurchase requests increased $2.9 billion to $13.6 billion due to an increase in submissions from the GSEs on both remaining Countrywide originations not covered by the agreements we announced in January and legacy Bank of America originations.  Part of the increase was the result of lower submissions in the fourth quarter as we finalized the GSE agreements.

These disclosures were materially false and misleading when made in that they failed to address the AIG loss contingency, which was the single largest potential legal liability confronting BAC, and which was known by Defendant Noski to be more than "reasonably possible" to result in an unfavorable outcome to BAC.

71.     On April 15, 2011, the NEW YORK TIMES reported on BAC's problems with litigation exposure in an article entitled *Bank of America's Legal Woes*:

Bank of America's quarterly earnings release barely mentioned the financial firm's legal woes.  But that doesn't mean they're not still a drag on profits.

Like its peers, Bank of America faces a wave of lawsuits from institutional investors and others who want the firm to repurchase billions of dollars in bad mortgages.  The bank has said it could spend anywhere from $7 billion to $10 billion buying back troubled loans.

But the bank glossed over the legal problems in its earnings announcement, instead addressing the issue in three separate releases on the same day.

In one release, the company announced it had created a new position, the global chief of legal, compliance, and regulatory

relations.  The role will be filled by Gary Lynch, formerly of Morgan Stanley.

Bank of America said in another item that it had reached a settled repurchase claims with Assured Guaranty, a monoline insurer.  As part of the agreement, the bank made a $1.1 billion cash payment. The total bill for deal ran an estimated $1.6 billion, which the company had accounted for by the end of the first quarter.

To get the real meat of Bank of America's legal liabilities, investors have to dig to Page 21 of the first-quarter earnings presentation.  There, the company highlights that repurchase claims jumped to $13.6 billion in the first quarter, up from $10.7 billion the previous quarter.

The biggest increase came from government-sponsored entities, meaning Fannie Mae, Freddie Mac and the like.  The bank has already paid out some $3 billion to Fannie Mae and Freddie Mac. Outstanding claims by such firms rose to $5.3 billion, up from $2.8 billion in the fourth quarter of 2010 – reflecting "new claims" that were "not covered" by the previous agreements, the company said.

As a result, the bank's potential hit on the claims increased, too. Bank of America's liability increased by $800 million in the first quarter, bringing the total amount to $6.2 billion.  That's up from $3.3 billion in the same period of 2010.

**B.    The Q1 2011 Form 10-Q**

72.    On May 5, 2011, BAC filed a quarterly report with the SEC for the first quarter of 2011 (ended March 31, 2001) on Form 10-Q (the "Q1 2011 Form 10-Q").[24]  The Q1 2011 Form 10-Q was signed by Defendant Cotty in his capacity as Chief Accounting Officer and incorporated by reference the false and misleading disclosures regarding BAC's loss contingencies from litigation that were contained in the 2010 Form 10-K and was thus materially false and misleading for the same reasons.  Additionally, pages 176-180 of the Q1 2011 Form 10-Q provided numerous "updates" on pending litigation, but again failed to provide any disclosure whatsoever of the AIG litigation, the existence of the tolling agreement that had been

---

[24] Bank of America Corporation Q1 2011 Quarterly Report (Form 10-Q) (May 5, 2011).

- 29 -

entered into between the parties, or a description of the highly detailed information about AIG's planned lawsuit that had been disclosed to BAC.  Accordingly, these disclosures in the Q1 2011 Form 10-Q were materially false and misleading when made.

73.     Additionally, these disclosures in the Q1 2011 Form 10-Q violated Item 303 of SEC Regulation S-K (17 C.F.R. § 229.303) in that, as described below, they failed to describe "any known trend or uncertainty" that could have a material impact on BAC's financial results.

74.     The above-cited disclosures in the Q1 2011 Form 10-Q also violated SEC Regulation S-X (17 C.F.R. § 210.4-01(a)(1)), which provides that financial statements that do not comply with GAAP are "presumed to be misleading."  Pursuant to GAAP, and specifically ASC 450 (as described in more detail below), a loss contingency involving an unasserted claim *must* be disclosed if it is reasonably possible that the outcome will be unfavorable.  Any reasonable company officer would be reckless in not recognizing that an unfavorable outcome was at least "reasonably possible" in light of the gross misconduct of BAC, Countrywide and Merrill Lynch and the waves of similar litigation that had already been settled by BAC for many billions of dollars for similar claims.  The failure to even provide a footnote disclosure of this AIG loss contingency thus violated GAAP and SEC regulations.

75.     Notwithstanding the falsity of these disclosures, Defendants Moynihan and Noski signed sworn certifications pursuant to Sarbanes-Oxley Sections 302 and 906 attesting to the accuracy of the financial statements in the Q1 2011 Form 10-Q, as well as BAC's systems of internal control in a form substantially identical to the Sarbanes-Oxley certifications identified above with respect to the 2010 Form 10-K.

**C.     BAC's $14 Billion Settlement of Claims Related to Countrywide RMBS Misconduct**

76.     On June 29, 2011, BAC issued a press release announcing it would pay a settlement of $8.5 billion to cover claims related to 525 former Countrywide issuing trusts.  But

- 30 -

again, there was no disclosure of the AIG claim looming over the head of the Company.  BofA stock closed at $11.08 per share.

77.    On June 29, 2011, the CHARLOTTE OBSERVER reported that, in addition to the $8.5 billion BAC would pay to investors, it would also pay an additional $5.5 billion to Freddie Mac and Fannie Mae, for a total of $14.0 billion in settlements resulting from defective mortgage underwriting processes:

> Bank of America Corp. announced Wednesday morning that it has agreed to pay $8.5 billion to settle claims by a group of investors that took losses on soured mortgage-backed securities.  The settlement covers nearly all of the exposure the bank faces from former Countrywide Financial first-lien mortgage securitizations, Bank of America said in a news release.  The agreement covers 530 mortgage bond trusts with original principal of $424 billion.  The agreement is supported by major investors, including money manager BlackRock and the Federal Reserve Bank of New York.  It still needs court approval.  Bank of America also plans to set aside an additional $5.5 billion to cover mortgage repurchase requests by mortgage giants Freddie Mac and Fannie Mae and other entities in the second quarter.

> *    *    *

> 'This is another important step we are taking in the interest of our shareholders to minimize the impact of future economic uncertainty and put legacy issues behind us,' Bank of America Chief Executive Brian Moynihan said in a statement.  'We will continue to act aggressively, and in the best interest of our shareholders, to clean up the mortgage issues largely stemming from our purchase of Countrywide.'

## D.    BAC Secretly Participates in a Mediation with AIG

78.    In July 2011, BAC participated in a mediation with AIG regarding its planned $10 billion lawsuit.  The fact that BAC would agree to participate in such a mediation demonstrates conclusively that BAC believed it was "reasonably possible" it would suffer a loss from this litigation, or there would be no reason to participate.

79.     In an earnings conference call on July 19, 2011, Defendant Moynihan discussed the $8.5 billion settlement and BAC's liability generally while concealing the fact of AIG's looming litigation:

> As we discussed on the call on June 29 when we announced the settlement of private-label securities litigation, we have been working hard to put large pieces of uncertain risk behind us as a company and where we can do that on a basis reasonable to you as the shareholders. This quarter, following actions we took in last year's fourth quarter on the GSE's, in the first quarter on the mono lines, we have put another significant part of the rep and warranty exposure behind us in other mortgage-related matters.

This disclosure was materially false and misleading in that it concealed the existence of the large AIG litigation contingency.

E.     The Q2 2011 Form 10-Q

80.     On August 4, 2011, BAC filed a quarterly report with the SEC for the second quarter of 2011 (ended June 30, 2011) on Form 10-Q (the "Q2 2011 Form 10-Q").[25]  This filing was signed by Defendant Cotty in his capacity as Chief Accounting Officer of the Company. Even though the Defendants were well aware that the AIG litigation was imminent, and that MTO had already been formally retained to prepare the defense to the imminent AIG lawsuit, and that MTO had even begun to correspond with AIG's counsel, BAC deliberately failed to inform the market of the pending AIG litigation.

81.     The Q2 2011 Form 10-Q was signed by Defendant Cotty in his capacity as Chief Accounting Officer and incorporated by reference the false and misleading disclosures regarding BAC's loss contingencies from litigation that were contained in the 2010 Form 10-K and was thus materially false and misleading for the same reasons.  Additionally, pages 189-195 of the Q2 2011 Form 10-Q provided numerous "updates" on pending litigation, but again failed to

---

[25] Bank of America Corporation Q2 2011 Quarterly Report (Form 10-Q) (August 4, 2011).

disclose the tolling agreement that had been entered into between BAC and AIG, the highly

detailed information about AIG's planned lawsuit that had been disclosed to BAC, that MTO had

been retained by BAC to defend it in the imminent litigation, the extent of the contingent losses,

and the unfavorable outcome for the Company, which was "reasonably possible."  Accordingly,

the Q2 2011 Form 10-Q was materially false and misleading when made because it failed to

disclose the above information relating to the AIG loss contingency.

82.     Additionally, these disclosures in the Q2 2011 Form 10-Q violated Item 303 of

SEC Regulation S-K (17 C.F.R. § 229.303) in that, as described below, they failed to describe

"any known trend or uncertainly" that could have a material impact on BAC's financial results.

83.     The above-cited disclosures in the Q2 2011 Form 10-Q also violated SEC

Regulation S-X (17 C.F.R. § 210.4-01(a)(1)), which provides that financial statements that do

not comply with GAAP are "presumed to be misleading."  Pursuant to GAAP, and specifically

ASC 450 (as described in more detail below), a loss contingency involving an unasserted claim

*must* be disclosed if it is reasonably possible that the outcome will be unfavorable.  Any

reasonable company officer would be reckless in not recognizing that an unfavorable outcome

was at least "reasonably possible" in light of the gross misconduct of BAC and the waves of

similar litigation that had already been settled by BAC for many billions of dollars for similar

claims.  The failure to even provide a footnote disclosure of this AIG loss contingency thus

violated GAAP and SEC regulations.

84.     Notwithstanding the falsity of these disclosures, Defendants Moynihan and

Thompson signed sworn certifications pursuant to Sarbanes-Oxley Sections 302 and 906

attesting to the accuracy of the financial statements in the Q2 2011 Form 10-Q, as well as BAC's

systems of internal control in a form substantially identical to the Sarbanes-Oxley certifications

identified above with respect to the 2010 Form 10-K. These sworn certifications were materially false and misleading in that BAC's financial statements were false and misleading in that they failed to disclose the AIG loss contingency.

## VI.     THE TRUTH BEGINS TO COME TO LIGHT, "HAMMERING" BAC SHARES

85.     The Class Period ends on August 8, 2011 with the announcement of the filing of AIG's $10 billion lawsuit against BAC.  This 187 page complaint and its accompanying 349 exhibits was a massive undertaking, requiring approximately 7,400 hours of attorney time by one of the most sophisticated law firms in the country that relied on more than 1,900 pages of exhibits.  This complaint described interviews of former Bank of America employees, and relied upon a detailed forensic analysis of more than 262,000 loans underlying the RMBS, finding that 4 out of 10 of these mortgages differed significantly from the descriptions of the loans in the marketing materials.  Although this unprecedented lawsuit came as no surprise to BAC and the Individual Defendants, it was a complete shock to investors, sending BAC's shares down significantly when the truth was finally revealed.

86.     BAC's hometown newspaper, the CHARLOTTE OBSERVER, reported that BAC shares had been "hammered" because of disclosure of the AIG lawsuit:[26]

> Investors hammered Bank of America Corp. shares on Monday after insurer American International Group filed a multibillion-dollar lawsuit against the Charlotte bank that further complicates chief executive Brian Moynihan's efforts to put the bank's mortgage woes behind it.
>
> In trading reminiscent of the worst days of the financial crisis, the bank's shares closed down 20.3 percent at $6.51. . . The steep decline wiped away about $16 billion in shareholder wealth.

*     *     *

---

[26] Rothacker, *BofA stung by suit and stock drop*, CHARLOTTE OBSERVER (Aug. 8, 2011).

> In possibly the biggest suit of its kind, AIG is seeking $10 billion
> in damages for losses the insurer said it sustained from allegedly
> defective mortgages it bought from Bank of America, Countrywide
> Financial and Merrill Lynch.

This article also quoted an AIG spokesman responding to BAC's attempt to blame AIG

for being misled:

> It is disappointing but unsurprising that Bank of America continues
> to attempt to blame others for its own misconduct. Investors, no
> matter how sophisticated, were entitled to rely on its numerous
> written representations about the securities it sold. Now that it is
> clear that those representations were false, Bank of America must
> be held to account.

87.    Also on August 8, 2011, BLOOMBERG reported that BAC shares had dropped to

their lowest level since 2009, based on the revelation of the AIG litigation:[27]

> Bank of America Corp. dropped to its lowest level since March of
> 2009 in New York trading after American International Group,
> Inc. disclosed plans to sue over faulty mortgages and analysts
> speculated over a capital raise.
>
>                          *    *    *
>
> AIG, the insurer rescued by U.S. bailouts during the 2008 financial
> crisis, contends Bank of America caused more than $10 billion in
> losses to AIG, which had specialized in investments and insurance
> tied to mortgage bonds.

88.    As reported by the WALL STREET JOURNAL, the AIG "lawsuit is *one of the largest*

*of its kind brought by a single investor since the housing bubble popped*" and noted that the AIG

lawsuit signaled a possible onslaught of new cases, which only BAC would be aware of.[28]

89.    Similarly, on August 10, 2011, the FINANCIAL TIMES reported on the AIG

litigation and resulting loss of value suffered by BAC shares in an article entitled *Lawsuit Sends*

*BofA Shares Down 18%*:[29]

---

[27] Son, *BofA Retreats on AIG Lawsuit, Speculation Over Capital Raise*, BLOOMBERG (Aug. 8, 2011).

28 Simon and Holm, *AIG Suit Against BofA Is Latest From Mortgage Meltdown*, the WALL STREET JOURNAL (August 9, 2011).  http://online.wsj.com/article/SB10001424053111904007304576496101837999390.html.

Bank of America shares dropped as much as 17.8 percent in early
Wall Street trading, making it the worst performed in the S&P 500,
as the bank faced a $10.5bn lawsuit from AIG over the sale of
residential mortgage-backed securities allegedly 'marred by fraud,
misrepresentation and omissions.'

The lawsuit filed by the government-controlled insurer in the New
York Supreme Court on Monday, alleges that BofA and its
subsidiaries wrote 'defective' mortgages to borrowers who were
not in a position to repay, packaged them into supposedly low-risk
securities, and sold $28bn-worth to AIG using offering documents
that misrepresented the quality of the loans.

It is one of the largest institutional claims to arise from the 2008
financial crisis and stems from AIG's purchase of mortgage-
backed securities.

* * *

The AIG suit focuses on alleged misdeeds at BofA and two of its
crisis-era acquisitions – Merrill Lynch and Countrywide Financial.
It alleges that the offering documents for the 593 securities
misrepresented the quality of the underlying mortgages and
'grossly underestimated the riskiness.'  Among other things, the
securities allegedly overstated the loan-to-value ratios, the rate of
owner occupancy and the credit ratings of the borrowers.

The complaint alleges that one BofA employee said he did not care
'about debt-to-income ratios' as 'we [Bank of America] can sell
[the loans] to whoever.'

90.    On August 15, 2011, FORBES reported on the AIG lawsuit, in an article entitled

*AIG's Bank of America Suit Puts Trashy Paper on Display*.[30]  The article described how the AIG

lawsuit showed BAC's misconduct "with compelling evidence":

I finally got around to reading American International Group's
lawsuit against Bank of America and it's scary stuff, even in
retrospect.  The 193-page lawsuit reveals how thousands of
overpaid professionals made their livings in the middle years of the
last decade.  It also shows, once again, how important is to make
public the loan files and performance data that lay under trillions

---

[29] Braithwaite and Masters, *Lawsuit Sends BofA Down 18%*, FINANCIAL TIMES (Aug. 10, 2011).

[30] Fisher, *AIG's Bank of America Suit Puts Trashy Paper on Display*, FORBES (August 15, 2012).

of dollars worth of mortgage-backed securities.  Bits are cheap; there's no reason in the Internet era all this stuff couldn't be online.

In the lawsuit AIG shows, *with compelling evidence*, how Bank of America's soon-to-be-subsidiaries Countrywide and Merrill Lynch stuffed thousands of bad loans into some 350 mortgage-backed securities issues that AIG bought for $28 billion between 2005 and 2007.  (Emphasis added.)

Of course, this "compelling evidence" had been provided to BAC prior to the start of the

Class Period, but BAC hid this evidence from investors in its SEC filings and public statements.

91.    On August 30, 2011, REUTERS confirmed the above allegations, in an article

entitled "*Exclusive: Bank of America Kept AIG Legal Threat Under Wraps*":[31]

(Reuters) - *Top Bank of America Corp lawyers knew as early as January that American International Group, Inc. was prepared to sue the bank for more than $10 billion, seven months before the lawsuit was filed, according to sources familiar with the matter.*

Bank of America shares fell more than 20 percent on August 8, the day the lawsuit was filed, adding to worries about the stability of the largest U.S. bank.  It wasn't until Warren Buffett stepped up with a $5 billion investment that those fears were eased, though hardly eliminated.

The bank made no mention of the lawsuit threat in a quarterly regulatory filing with the U.S. Securities and Exchange Commission just four days earlier.  Nor did management discuss it on conference calls about quarterly results and other pending legal claims.

\*    \*    \*

Before suing Bank of America, AIG spent months analyzing publicly available data on a sample of 262,322 loans behind mortgage-backed securities it bought from Bank of America and its Merrill Lynch and Countrywide units between 2005 and 2007.

In its court filing, AIG said marketing materials touted the loans as being much safer than they were.

---

[31] LaCapra, *Exclusive: Bank of America Kept AIG Legal Threat Under Wraps*, REUTERS (August 30, 2011).

For instance, AIG said that in almost every bond offering, it was told that none of the mortgages were worth more than the value of the underlying property, when in fact one in six loans were underwater from the day they were born.

AIG raised such issues with Bank of America in January and said it planned to sue unless a settlement could be reached, sources familiar with the matter told Reuters.  The sources either had direct knowledge of the legal proceedings or were briefed on them, but were not authorized to discuss the case publicly.

Both sides entered a 'tolling agreement' to stop any legal statutes of limitation from running out while settlement talks were underway, but by March it became clear that AIG was prepared to sue for more than $10 billion, the people said.

Bank of America disputed AIG's claims, saying losses stemmed from the insurer's flawed decision making, as well as broader declines in home values and capital markets, the people said.  The parties agreed to enter mediation proceedings during the second quarter, and also floated other proposals to no avail, the people said.  (Emphasis added.)

92.     On February 23, 2012, BAC filed its annual report for the year ending

December 31, 2011 on Form 10-K with the SEC (the "2011 Form 10-K").  In this filing, the

Company finally disclosed the nature of this massive loss contingency:

**AIG Litigation**

On August 8, 2011, American International Group, Inc. and certain of its affiliates (collectively, AIG) filed a complaint in New York Supreme Court, New York County, in a case entitled *American International Group, Inc. et al. v. Bank of America Corporation et al.*  AIG has named the Corporation, Merrill Lynch, CHL and a number of related entities as defendants.  AIG's complaint asserts certain RMBS Claims pertaining to 347 RMBS offerings and two private placements in which it alleges that it purchased securities between 2005 and 2007. AIG seeks rescission of its purchases or a rescissory measure of damages or, in the alternative, compensatory damages of no less than $10 billion; punitive damages; and other unspecified relief.  Defendants removed the case to the U.S. District Court for the Southern District of New York and filed a notice with the JMDL seeking to add the case to the Countrywide RMBS MDL.  The district court denied AIG's motion to remand the case to state court.  Plaintiffs are seeking an interlocutory

- 38 -

appeal to the U.S. Court of Appeals for the Second Circuit
following the district court's certification. On December 21, 2011,
the JMDL transferred the Countrywide RMBS claims to the
Countrywide RMBS MDL.  The non-Countrywide RMBS claims
will be heard in the U.S. District Court for the Southern District of
New York.

## VII.   VIOLATIONS OF REGULATION S-K

93.     The adverse information concealed by defendants during the Class Period and

detailed above was concealed from the investing public in violation of Item 303 of Regulation

S-K under the federal securities laws.  (17 C.F.R. § 229.303).

94.     Item 303 of Regulation S-K (17 C.F.R. § 229.303) required BAC to disclose the

AIG-related loss contingency.  Paragraph (a) of Item 303 deals with disclosures of facts that "are

necessary to an understanding of its financial condition," that "enable the reader to assess

material changes in financial condition and results of operations," and that "describe any known

trends or uncertainties that have had or that the registrant reasonably expects will have a material

favorable or unfavorable impact on net sales or revenues or income from continuing operations.

17 C.F.R. § 229.303(a)(1)-(3).

95.     The existence of the AIG loss contingency was:  (i) necessary to a proper

understanding of BAC's financial condition; (ii) necessary to enable the reader to assess material

changes in the financial condition of BAC; and (iii) an uncertainty (and also a part of a known

trend) that could reasonably have a material impact on the income from continuing operations of

BAC.  As disclosed in the 2010 Form 10-K, BAC's annual net income for 2010, 2009 and 2008

was a loss of $2.2 billion, and net income of $6.3 billion and $4.0 billion respectively.[32]

---

[32] 2010 Form 10-K, p. 137.  The financial statements also disclosed that BAC's revenues were "only"
approximately $110 billion in 2010, $120 billion in 2009 and $73 billion in 2008.

## VIII.   BAC'S FALSE AND MISLEADING FINANCIAL STATEMENTS

96.     The Company's financial statements and the statements about the Company's

financial results were false and misleading, as such financial information was not prepared in

conformity with GAAP, nor was the financial information a fair presentation of the Company's

operations due to the Company's improper accounting for, and disclosure about its revenues and

failure to accurately disclose loss contingencies, in violation of GAAP and SEC Regulation S-X.

97.     BAC's 2010 Form 10-K represented that its financial statements were prepared in

accordance with GAAP.

98.     GAAP are those principles recognized by the accounting profession as the

conventions, rules and procedures necessary to define accepted accounting practice at a

particular time.  Regulation S-X (17 C.F.R. § 210.4-01(a)(1)) states that financial statements

filed with the SEC which are not prepared in compliance with U.S. GAAP are "presumed to be

misleading and inaccurate."  Regulation S-X requires that interim financial statements must also

comply with GAAP, with the exception that interim financial statements need not include

disclosures which would be duplicative of disclosures accompanying annual financial

statements.  17 C.F.R. § 210.10-01(a).

99.     Accounting Standards Codification 450 ("ASC 450"), *Contingencies*, is the

authoritative source of GAAP for loss contingencies.[33]  A loss contingency is defined by the

ASC glossary as "[a]n existing condition, situation or set of circumstances involving uncertainty

as to possible loss to an entity that will ultimately be resolved when one or more future events

occur or fail to occur."

---

[33] On July 1, 2009, the Accounting Standards Codification became the single official source of GAAP, and superseded all FASB, AICPA and EITF standards and related literature.

100.    ASC 450 provides that a contingency must be accrued – and that a charge must be taken against net income for the period, if both the following conditions are met:  (a) information before the financial statements are issued … indicates that it is probable that … a liability had been incurred as of the date of the financial statements; and (b) the amount of the loss can be reasonably estimated.  ASC 450-20-25-2.

101.    If an accrual is not required, footnote disclosure of a loss contingency is required by a company if the loss is "reasonably possible."[34]  ASC 450-20-50-3 and ASC 275-10-50-8.

102.    ASC 450-20-05-10 lists examples of the types of loss contingencies covered by ASC 450, and specifically includes "actual or possible claims and assessments."  At a minimum, ASC 450-20-50-6 provides that a loss contingency involving a manifested but yet unfiled claim must be disclosed if there is a reasonable possibility that the outcome will be unfavorable.

103.    As described above, Defendants were aware prior to, and at all times during the Class Period that AIG had manifested its knowledge of its potential claim against BAC, and that such claim was reasonably possible to result in an unfavorable outcome for BAC.

## IX.    LOSS CAUSATION

104.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic losses suffered by Plaintiffs and the Class.

105.    Throughout the Class Period, as set forth above, the market price of BAC shares was inflated by the material omissions and false and misleading statements made by the Company and the Individual Defendants, which were widely disseminated to the securities markets, investment analysts and the investing public.  The false and misleading statements

---

[34] The ASC Master Glossary defines "reasonably possible" as "more than remote, but less than likely."

materially misrepresented to the market the Company's financial results and prospects, and caused BAC shares to trade at prices in excess of their true value.

106.     As a result, Plaintiffs and the Class purchased BAC shares at artificially inflated prices.  When the truth about BAC's contingent liabilities to AIG, and the impact of these liabilities on BAC's financial results and prospects were revealed to the market, the price of BAC shares declined in response, as the artificial inflation caused by Defendants' misrepresentations and omissions was removed from the price of BAC shares, thereby causing substantial damages to Plaintiffs and the Class.

107.     Immediately prior to the Class Period, BAC shares closed trading at $13.97 per share on February 24, 2011.  During the Class Period, BAC shares slowly drafted downward based on deteriorating financial results, due in significant part to dramatically increasing costs of settling various litigation related to Countrywide and Merrill Lynch misconduct.  By August 3, 2011, BAC shares traded at $9.49 per share.  As the news of the AIG loss contingency began to "leak out" to the market, BAC shares closed at $8.83 per share on August 4, 2011 and at $8.17 per share on August 5, 2011 – a two day decline of $1.32 per share or 13.9%.

108.     On August 8, 2011, news of the AIG litigation filed against BAC finally reached the market.  This bad news "hammered" (in the words of BAC's hometown newspaper the CHARLOTTE OBSERVER) the Company's stock an additional 20.3%, closing at $6.51 per share.

## X.     NO SAFE HARBOR

109.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to

- 42 -

differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of BAC who knew that those statements were false when made.

## XI.   APPLICABILITY OF PRESUMPTION OF RELIANCE

110.   At all relevant times, the market for BAC common stock was an efficient market for the following reasons, among others:

(a)   BAC common stock met the requirements for listing and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b)   as a regulated issuer, BAC filed periodic public reports with the SEC and the NYSE;

(c)   BAC regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)   BAC was followed by numerous securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

111.     As a result of the foregoing, the market for BAC common stock promptly
digested current information regarding BAC from all publicly available sources and reflected
such information in the prices of the stock.  Under these circumstances, all purchasers of BAC
securities during the Class Period suffered similar injury through their purchase of BAC common
stock at artificially inflated prices and a presumption of reliance applies.

## XII.    APPLICABILITY OF THE GROUP PLEADING DOCTRINE

112.     Each of BAC's filings with the SEC identified above (the 2010 Form 10-K, the
Q1 2011 Form 10-Q, the Q2 2011 Form 10-Q and the Q3 2011 Form 10-Q) were considered to
be "group pleading" or "group published" documents.

113.     Each of the Individual Defendants had direct involvement in the Company's day-
to-day operations and were responsible for the Company's representations in its press releases
and SEC filings.

114.     Accordingly, each of the misrepresentations and omissions complained of herein
are properly attributed to each of the Individual Defendants.

## XIII.   ADDITIONAL SCIENTER ALLEGATIONS

**A.     Circumstantial Evidence of Conscious Misbehavior or Recklessness**

115.     BAC and each of the Individual Defendants made false or misleading statements
when contradictory facts of critical importance to the Company either were apparent, or should
have been apparent to them.  The 2010 Form 10-K, the Q1 2011 Form 10-Q and the Q2 2011
Form 10-Q and other public statements each concealed the existence of the AIG loss
contingency.

116.     Although in making these public disclosures Defendants, acted as if the AIG loss
contingency and potential litigation did not exist, BAC and the Individual Defendants were
actually in possession of specific information that the AIG litigation was more than "reasonably

likely" to result in adverse consequences for BAC.  Specifically, BAC and the Individual

Defendants knew that:  (1) Countrywide, Merrill Lynch and BAC had each engaged in

widespread misconduct regarding mortgage underwriting; (2) the disclosures in the Offering

Memoranda cited by AIG as the basis for its claims were false and misleading and violated

securities laws and various state laws; and (3) BAC had already paid billions of dollars to settle

similar claims.

117.    Likewise, the sworn Sarbanes-Oxley certifications of Moynihan (in the 2010

Form 10-K and the Q1 2011 Form 10-Q and the Q2 2011 Form 10-Q), Noski (in the 2010 Form

10-K and the Q1 2011 Form 10-Q) and Thompson (in the Q2 2011 Form 10-Q) attest to the fact

that each of these Defendants had personally overseen the development of BAC's system of

internal controls to "ensure that material information relating to the registrant, including its

consolidated subsidiaries, is made known to us by others within those entities."  Accordingly,

Defendants Moynihan, Noski and Thompson must have been aware of the material information

about a $10 billion lawsuit.

118.    Additionally, knowledge of the AIG loss contingency is properly attributed to

each of the Individual Defendants.  The scope of the AIG prospective litigation was so important

to the financial well-being of BAC because litigation of this magnitude could rightly be

considered a "core operation" of the Company.  Accordingly, it would be unreasonable for

executive officers of BAC to be unaware of the probability of litigation to be filed by AIG

against the Company.  For example, it would be unreasonable to assume that Defendant

Moynihan, as CEO of the Company (and himself just two years earlier acting as General Counsel

for the Company) was unaware that the Company had entered into a tolling agreement regarding

a $10 billion legal claim to be brought by one of the largest insurance companies in the world.

Accordingly, an inference arises in this case that the Individual Defendants had knowledge of the AIG loss contingency by virtue of their positions within the company.

119.    Further confirming the scienter of the Defendants is the fact that in October 2010, the Division of Corporate Finance of the SEC posted on the SEC's website and sent a highly-publicized "Dear CFO" letter to certain public companies warning them of their disclosure obligations "related to potential risks and costs associated with mortgage and foreclosure-related activities or exposures."[35]  The SEC guidance specifically addressed the disclosure obligations regarding litigation contingencies:

> In addition, ASC Subtopic 450-20 (SFAS 5) requires you to establish accruals for litigation and other contingencies when it is probable that a loss has been incurred and the amount of the loss can be reasonably estimated.  When a loss is not both probable and estimable, an accrual is not recorded, **but disclosure of the contingency is required to be made when there is at least a reasonable possibility that a loss or an additional loss has been incurred**.  The disclosure should indicate the nature of the contingency and give an estimate of the possible loss or range of loss or state that such an estimate cannot be made.  Rule 10-01(a)(5) of Regulation S-X requires the disclosure of material contingencies in interim financial statements.  (Emphasis added.)

Despite this clear guidance from the top regulatory authority, BAC concealed the existence of the AIG loss contingency throughout the Class Period.

120.    Having knowledge of the AIG loss contingency, in the face of the clear provisions of ASC 450 and SEC guidance, the failure to disclose the existence of the AIG loss contingency could only have been done knowingly or recklessly.

---

[35] See http://www.sec.gov/divisions/corpfin/guidance/cfoforeclosure1010.htm.

**B.     Motive and Opportunity**

121.    In addition to the strong circumstantial evidence of conscious misbehavior or recklessness outlined above, the Defendants' scienter is also demonstrated by their strong motives to keep the AIG claim hidden from the investing public.

122.    BAC and its executives were under tremendous pressure at the end of 2010 to: 1) raise additional capital from investors to remain independent and meet regulatory requirements; and 2) to increase its dividend.  Disclosing the AIG loss contingency earlier in the Class Period would have raised concerns from potential investors, thus rendering BAC unable to raise additional capital and threatening its independence, and would have shown the dividend policy to be illusory.

123.    Prior to, and during the Class Period, these were significant questions regarding BAC's ability to survive as an independent entity because of the crushing weight of its litigation liabilities.  BAC was also facing a serious capital shortage, and needed to raise additional capital from investors to finance the bank (including paying off its legal liabilities) as well as prepare for upcoming changes in regulatory capital requirements.

124.    A September 7, 2011 BLOOMBERG article entitled *Moynihan Tries to Keep BofA Intact as Mortgage Loans Fall Apart*, described how desperate the situation had become in August 2011 for BAC, and how the continuing legal liabilities threatened BAC's independence and ability to raise capital, and remain independent:

> The wild speculation about a forced merger combined ominously with financial analyst chatter that the mortgage onslaught would drain BofA's capital, requiring it to sell more stock in desperation. Would Bank of America, which just weeks earlier had reported a record second-quarter loss of $8.8 billion, go the way of Bear Stearns Cos. or Lehman Brothers Holdings Inc.?
>
> It was starting to smell like 2008. Hotshot BofA investment bankers gaped at $14 restricted stock units, granted in 2010 and early 2011, which on paper had lost half of their value. They began thumbing smartphones for contact info of potential

alternative employers. Managers interrupted vacations to rush into the office and calm valuable dealmakers.

125.    With investors concerned about BAC's very viability, based largely upon its legal exposures, the Defendants did everything they could to minimize the perception that legal settlements could force the company to "go the way of Bear Stearns Cos. or Lehman Brothers Holdings Inc."  For example, during the January 21, 2011conference call regarding the Q4 2010 financial results, Defendant Moynihan stressed BAC's "focus" on "clean up" issues related to Merrill Lynch and Countrywide liabilities:

> As we think about 2010, we came in to the year with a focus on continuing to clean up the issues left over from the crisis.

126.    With analysts and investors acutely concerned about BAC's legal liabilities and Moynihan's promise to "focus" on the "clean up" of the legal liabilities, BAC had a significant motive to conceal the AIG litigation – the biggest lawsuit of its kind – from the market in order to make the company appear more well capitalized and less risky, and enable the bank to raise additional capital.

127.    BAC was also under significant pressure from investors to increase its dividend level to shareholders, which stood at a paltry $0.01 per share.  But a dividend increase required the approval of the Federal Reserve.  On January 7, 2011, BAC submitted a comprehensive capital plan to the Federal Reserve, which included a request to increase its dividend to shareholders.  BAC was aware that its outstanding litigation would be a critical factor in determining whether its request would be approved, which provided a powerful motive not to alert the Federal Reserve or the market to the probability of a $10 billion lawsuit from AIG.

- 48 -

128.     On March 18, 2011, the Federal Reserve refused to allow BAC to raise its

dividend.  The Federal Reserve applies a somewhat subjective test as to whether banks "have the

capital, on a total consolidated basis, necessary to absorb losses as a result of adverse economic

conditions."  12 U.S.C. § 5365(i)(1)(A).

129.     BAC was the only one of the four major banks that the Federal Reserve did not

allow to raise their dividend to shareholders.  As reported by THE NEW YORK POST, analysts

believed the Federal Reserve took this action because of BAC's outstanding legal liabilities:[36]

> "The [Fed] is clearly not comfortable with BofA's projected profitability because
> of all the outstanding liabilities they have," said Jonathan Finger, managing
> partner at Finger Interests Number One, which owns a substantial chunk of BofA.

130.     The CHARLOTTE OBSERVER reported on March 24, 2011 that analysts took the

Fed's rejection of the dividend increase as harmful to BAC's attempts to rebuild its credibility:[37]

> In the latest sign Bank of America lags its rivals in recovering from the financial
> crisis, the Charlotte bank said Wednesday the Federal Reserve rejected its request
> for a "modest" dividend increase in the second half of the year.
>
> *     *     *
>
> The Fed's rejection means the Charlotte bank's long-suffering shareholders will
> continue to receive penny-per-share quarterly dividends, although it's possible an
> increase could come later this year. Bank of America said it plans to resubmit its
> request in coming months.
>
> "This is disappointing and a step back for (Bank of America ) in terms of trying to
> rebuild credibility and confidence," Andrew Marquardt, an analyst with Evercore
> Partners, said in a research report, although he continued to recommend the stock.

131.     As reported by the Philadelphia Tribune on July 5, 2011, BAC's capitalization

woes because of its litigation exposure and pressure to increase its dividend was not common

among all of the large banks, *but unique to BAC*:

---

[36] *No Beauty Contest - BofA Takes Over Worst-In-Show Title From Citi*, THE NEW YORK POST (Mar. 24, 2011).

[37] *Fed rejection of dividend hike shows BofA's woes*, CHARLOTTE OBSERVER (March 24, 2011).

- 49 -

Bank of America is in worse shape than other major banks like JPMorgan Chase
& Co. and Wells Fargo & Co. because of its purchase of Countrywide for $4
billion in 2008. What seemed like a bargain price for the country's largest
mortgage lender has cost the bank tens of billions more in mortgage losses,
regulatory fines, repurchases of poorly-written loans and expensive litigation. At
the same time, Bank of America itself had written a fair amount of bad mortgages.
As it stands, the bank services one out of every five U.S. mortgages.

So even though most of the major banks sold the same kind of securities and have
bad mortgages on their books, analysts say they are in better shape than Bank of
America, which has $2.2 trillion in assets.

**The other banks don't have the same pressure to put the mortgage woes
behind them**. In March, the Federal Reserve didn't allow Bank of America  to
increase its dividend, citing uncertainty about the depth of its mortgage problems.
It was the only denial issued to any of the four largest U.S. banks. And it raised
questions over whether the bank was strong enough to withstand another
economic downturn.

132.    Thus, BAC had significant motives that were unique to BAC to conceal the AIG

loss contingency.

### XIV.   CLASS ACTION ALLEGATIONS

133.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil

Procedure 23(a) and (b)(3) on behalf of a class consisting of all those who purchased shares of

BAC stock between February 25, 2011, and August 8, 2011, inclusive, (the "Class Period") and

who suffered losses as a result (the "Class").  Excluded from the Class are Defendants, the

officers and directors of BAC, at all relevant times, members of their immediate families and

their legal representatives, heirs, successors or assigns and any entity in which Defendants have

or had a controlling interest.

134.    The members of the Class are so numerous that joinder of all members is

impracticable.  Throughout the Class Period, BAC common stock was actively traded on the

New York Stock Exchange.  While the exact number of Class members is unknown to Plaintiffs

at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that

there are many thousands of members in the proposed Class.  Record owners and other members

of the Class may be identified from records maintained by BAC or its transfer agent and may be

notified of the pendency of this action by mail, using the form of notice similar to that

customarily used in securities class actions.

135.    Plaintiffs' claims are typical of the claims of the members of the Class as all

members of the Class are similarly affected by Defendants' wrongful conduct in violation of

federal law complained of herein.

136.    Plaintiffs will fairly and adequately protect the interests of the members of the

Class and have retained counsel competent and experienced in class action and securities

litigation.

137.    Common questions of law and fact exist as to all members of the Class and

predominate over any questions solely affecting individual members of the Class.  Among the

questions of law and fact common to the Class are:

(a)    whether the federal securities laws were violated by Defendants' acts as

alleged herein;

(b)    whether statements made by Defendants to the investing public during the

Class Period misrepresented material facts about the business and operations of BAC;

(c)    whether the price of BAC securities were artificially inflated during the

Class Period; and

(d)    to what extent the members of the Class have sustained damages and the

proper measure of damages.

138.    A class action is superior to all other available methods for the fair and efficient

adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as

the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## COUNT I

### Violation of Section 10(b) of
### the Exchange Act and Rule 10b-5
### Promulgated Thereunder Against All Defendants

139.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

140.    During the Class Period, Defendants disseminated or approved the materially false and misleading statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

141.    Defendants:  (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

142.    Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for BAC securities.  Plaintiffs and the Class would not have purchased BAC securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

- 52 -

143.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their purchases of BAC securities during the Class Period.

## COUNT II

### Violation of Section 20(a) of
### the Exchange Act Against the Individual Defendants

144.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

145.    The Individual Defendants acted as controlling persons of BAC within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By reason of their positions as officers and/or directors of BAC, and their ownership of BAC stock, the Individual Defendants had the power and authority to cause BAC to engage in the wrongful conduct complained of herein.  By reason of such conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray for relief and judgment, as follows:

A.    Determining that this action is a proper class action, designating Plaintiff as Lead Plaintiff and certifying Lead Plaintiff as Class representative under Rule 23 of the Federal Rules of Civil Procedure and Lead Plaintiff's counsel as Lead Counsel;

B.    Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.      Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

DATED:  July 20, 2012

HAGENS BERMAN SOBOL SHAPIRO LLP

By: _____
       Jason A. Zweig (JZ-8107)
One Penn Plaza, 36th Floor
New York, NY 10119
Telephone: (212) 752-5455
Facsimile: (917) 210-3980
jasonz@hbsslaw.com

Steve W. Berman
Karl P. Barth
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 Eighth Avenue, Suite 3300
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
steve@hbsslaw.com
karlb@hbsslaw.com

Reed R. Kathrein
Peter E. Borkon
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
reed@hbsslaw.com
peterb@hbsslaw.com

*Counsel for Lead Plaintiff Camcorp Interests Limited*

Robert M. Roseman
Andrew D. Abramowitz
Daniel J. Mirachi
SPECTOR ROSEMAN KODROFF & WILLIS, P.C.
1818 Market Street, Suite 2500
Philadelphia, PA  19103
Telephone:  (215) 496-0300
Facsimile:   (215) 496-6611
rroseman@srkw-law.com

Samuel H. Rudman
David A. Rosenfeld
ROBBINS GELLER RUDMAN & DOWD LLP
58 South Service Road, Suite 200
Melville, NY 11747
Telephone: (631) 367-7100
Facsimile: (631) 367-1173
srudman@rgrdlaw.com
drosenfeld@rgrdlaw.com

*Additional Counsel for Plaintiffs*

010282-11  537320 V1