UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
────────────────────────────────

IN RE BANK OF AMERICA AIG DISCLOSURE
SECURITIES LITIGATION

────────────────────────────────

11 Civ. 6678 (JGK)


OPINION AND ORDER


JOHN G. KOELTL, District Judge:


     This action is another in the series of cases arising out
of the collapse of the market for mortgage backed securities
("MBS").  In this case, the plaintiffs are purchasers of Bank of
America ("BoA") stock.  BoA and its subsidiaries sold a
substantial amount of MBS to American International Group, Inc.
("AIG").  BoA made extensive public disclosures about the amount
of MBS that it and its subsidiaries had sold, as well as the
increasing risks of material litigation against it, together
with disclosures of actual litigation that had been filed
against it.  In this lawsuit, the plaintiffs allege that BoA and
four of its officers (collectively, "defendants") defrauded
investors by failing to disclose the imminence and amount of a
potential MBS lawsuit by AIG against BoA ("the AIG suit").

     The plaintiffs assert violations of Section 10(b) of the
Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule
10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.  The
plaintiffs also assert control person liability under Section
20(a) of the Securities Exchange Act, 15 U.S.C. § 78t(a),

against the four BoA officers: Chief Executive Officer Brian
Moynihan, Chief Financial Officer and Vice Chairman Charles
Noski, Chief and Principal Accounting Officer Neil Cotty, and
Chief Risk Officer Bruce Thompson (collectively the "individual
defendants").[1]

The defendants move to dismiss the Second Amended Complaint
for failure to state a claim under Federal Rule of Civil
Procedure 12(b)(6).  This court has subject matter jurisdiction
pursuant to 15 U.S.C. § 78aa, and 28 U.S.C. § 1331.  For the
reasons explained below, the motion to dismiss is granted.


**I.**

In deciding a motion to dismiss pursuant to Rule 12(b)(6),
the allegations in the complaint are accepted as true, and all
reasonable inferences must be drawn in the plaintiffs' favor.
McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 191 (2d Cir.
2007).  The Court's function on a motion to dismiss is "not to
weigh the evidence that might be presented at a trial but merely
to determine whether the complaint itself is legally
sufficient."  Goldman v. Belden, 754 F.2d 1059, 1067 (2d Cir.
1985).  A complaint should not be dismissed if the plaintiffs

_____

[1] Noski served as BoA's Chief Financial Officer until June, 2011,
at which point he became Vice Chairman of BoA.  When Noski
became Vice Chairman, Thompson became Chief Financial Officer.

have stated "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the plaintiff[s] plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).  While factual allegations should be construed in the light most favorable to the plaintiffs, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." Id.

A claim under Section 10(b) of the Securities Exchange Act sounds in fraud and must meet the pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure and the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4(b).  Rule 9(b) requires that the complaint "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 99 (2d Cir. 2007).  The PSLRA similarly requires that the complaint "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading," and it adds the requirement that "if an allegation regarding the

3

statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed."  15 U.S.C. § 78u-4(b)(1); ATSI, 493 F.3d at 99; see also City of Roseville Emps' Ret. Sys. v. Energysolutions, Inc., 814 F. Supp. 2d 395, 401 (S.D.N.Y. 2011).

When presented with a motion to dismiss pursuant to Rule 12(b)(6), the Court may consider documents that are referenced in the complaint, documents that the plaintiffs relied on in bringing suit and that are either in the plaintiffs' possession or that the plaintiffs knew of when bringing suit, or matters of which judicial notice may be taken.  See Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2000).  Matters of which judicial notice can be taken include press coverage establishing what information existed in the public domain during periods relevant to the plaintiffs' claims.  Staehr v. Hartford Fin. Serv. Grp., Inc., 547 F.3d 406, 425 (2d Cir. 2008).  The Court can also take judicial notice of public disclosure documents that must be filed with the Securities and Exchange Commission ("SEC") and documents that both "bear on the adequacy" of SEC disclosures and are "public disclosure documents required by law."  Kramer v. Time Warner, Inc., 937 F.2d 767, 773-74 (2d Cir. 1991).

4

## II.

The following facts are undisputed or accepted as true for purposes of this motion.

## A.

BoA is a Delaware company with its principal place of business in North Carolina. (SAC ¶ 23.) BoA underwrote "increasingly risky loans" to securitize and sell a significant number of MBS. (SAC ¶ 33.) BoA publicly disclosed that during 2004-2008, it and its subsidiaries originated, securitized, and sold nearly $2.1 trillion in MBS. (See Declaration of Newman A. Nahas in Supp. of Def.'s Mot. to Dismiss ("Nahas Decl.") Ex. 1 ("Annual Report") at 53-54.) BoA reported in February, 2011 that it had sold $963 billion in MBS to private parties from 2004 through 2008; however, the mortgages underlying $216 billion of that total were in default or severely delinquent. (Annual Report at 54.) When mortgage defaults rose from 1% prior to 2006 to 10% in 2009, BoA was "more exposed than any major bank" to the economic downturn. (SAC ¶ 28; 34 n.11, 35.) As a result, BoA has, in recent years, faced escalating exposure to various types of litigation over its involvement in the MBS market. (SAC ¶ 4.)

**B.**

This action concerns statements about litigation risk made by the defendants between February 25, 2011, the date of BoA's Annual Report or Form 10-K, and August 8, 2011, the date BoA announced it had been sued by AIG ("Class Period"). (SAC ¶¶ 10, 15.) The gist of the plaintiffs' complaint is that despite BoA's disclosure about the risks arising from its enormous sales of MBS, and the rising litigation risks specifically, it failed to disclose the imminence and size of the potential AIG suit.

At the beginning of the Class Period, BoA filed with the Securities and Exchange Commission ("SEC") its fiscal year 2010 Annual Report (the "Annual Report"). (SAC ¶ 10.) The Annual Report explicitly discussed BoA's escalating exposure to MBS litigation at different levels of particularity. (SAC Section V.A.) In a section prominently titled "Mortgage and Housing Market Related Risks," the Annual Report stated in bold that "[w]e face substantial potential legal liability and significant regulatory action, which could have a material adverse effect on our cash flows, financial condition, and results of operations, or cause significant reputational harm to us." (Annual Report at 16.) The Annual Report noted that "the volume of claims and amount of damages and penalties claimed in litigation and regulatory proceedings against [BoA] and other financial

institutions remain high and are increasing." (SAC ¶ 74.) The
Annual Report cautioned that BoA "continue[s] to face increased
litigation risk and regulatory scrutiny as a result of [its]
Countrywide and Merrill Lynch acquisitions" and warned that BoA
"and its subsidiaries are routinely defendants in or parties to
many pending or threatened legal actions and proceedings." (SAC
¶ 74.) The Annual Report disclosed that BoA's exposure to
"these litigation and regulatory matters and any related
settlements could have a material adverse effect on our cash
flows, financial condition, and results of operation." (SAC
¶ 74.)

       The Annual Report also referred readers to detailed
discussion of BoA's litigation exposure in Note 14 of the Annual
Report. (Annual Report at 16.) There, BoA warned that it
frequently could not predict how, when, and at what cost pending
matters would be resolved, especially when opposing litigants
raised novel legal arguments or sought "very large or
indeterminate damages." (Annual Report at 196.) Still, BoA
explained that, in accordance with applicable accounting
guidance, it accrued reserves for those litigation losses that
were "probable and estimable." (Annual Report at 196.) When a
loss contingency was not both probable and estimable, BoA did
not establish an accrued liability. (Annual Report at 196.)

BoA next explained that where accrual was not required, but a loss was probable or reasonably possible, BoA could sometimes estimate a loss or range of loss.  To determine whether it could estimate a range of loss for such matters, BoA reviewed material litigation with the help of outside counsel and in light of factual and legal developments.  Relevant considerations included "information learned through the discovery process, rulings on dispositive motions, settlement discussions, and other rulings by courts, arbitrators or others."  Once BoA completed this review, it aggregated potential losses into a single "estimated range of possible loss," that is, an amount by which BoA's exposure to litigation could exceed accruals.

However, BoA cautioned that it could not estimate a range of loss for all matters in which losses were probable or reasonably possible.  Moreover, BoA warned that "[t]hose matters for which an estimate is not possible are not included within [the] estimated range."  BoA also warned that "[t]he estimated range of possible loss represents what we believe to be an estimate of possible loss only for certain matters meeting these criteria."  (Annual Report at 196; see also SAC ¶ 71.)  BoA adopted this approach, of aggregating exposure above accruals and explaining that some matters were not included, at the SEC's urging.  (Declaration of George M. Garvey in Supp. of Def.'s

8

Mot. to Dismiss ("Garvey Decl.") Ex. 6 ("SEC Letter of July 2010") at 4.)  In its Annual Report, BoA disclosed an estimated range of possible loss for matters where an estimate is possible of $145 million to $1.5 billion over accruals.  (Annual Report at 196.)  AIG's potential suit was not represented within that loss range.  (SAC ¶ 165.)

BoA's Annual Report provided additional disclosure regarding MBS litigation.  For example, BoA stated that MBS litigants "generally allege . . . material misrepresentations and omissions, in violation of Sections 11 and 12 of the Securities Act of 1933 and/or state securities laws and other state statutory and common laws." (Annual Report at 201.)  BoA also described pending MBS matters, including various class actions against BoA and its subsidiaries.  (Annual Report at 201.)

BoA's subsequent Class Period filings with the SEC restated these categorical disclosures, as well as the general disclosures discussed above.  (SAC ¶¶ 92, 108.)  BoA's Class Period filings also disclosed separately BoA's exposure to, on the one hand, the group of fraud and securities claims described above, and, on the other, to a type of MBS action called a representation and warranty claim.  (Compare Annual Report at 9, 52, with Annual Report at 196, 201-02.)  Representation and

9

warranty claims sound in contract rather than fraud.  They are distinct from fraud and securities claims because they are available to claimants currently holding defective securities and allow investors to make various demands on BoA.  For example, when liable in contract for breaching a representation or warranty, BoA may be required to repurchase a defective security or indemnify its holder.  (SAC ¶ 36 n.14.)  It is undisputed that AIG's claims are fraud and securities claims, not representation and warranty claims.  (SAC ¶ 81.)

### C.

On January 13, 2011, before the Class Period began, BoA and AIG entered into an agreement tolling the statute of limitations on AIG's fraud and securities claims against BoA.  (SAC ¶¶ 7, 8.)  The tolling agreement provided the parties with an opportunity to negotiate a pre-litigation settlement.  (SAC ¶¶ 8, 56.)  It also identified with particularity the securities on which AIG's claims were based.  (SAC ¶ 57.)  BoA obtained more information about AIG's claims through settlement negotiations.  (SAC ¶ 60.)  In February 2011, AIG provided BoA with a "detailed analysis of its potential claims."  (SAC ¶ 9.)  AIG had purchased more than $28 billion of MBS from BoA and had lost more than $10 billion on those purchases.  (SAC ¶ 7.)

BoA did not disclose to the public information it had received under the tolling agreement with AIG.  However, there was substantial information in the public domain about AIG's MBS portfolio and how a substantial portion of that portfolio had been acquired from BoA and its subsidiaries.  For example, AIG published a precise breakdown of MBS it sold to the Federal Reserve Bank of New York in its 2010 third quarter filing with the SEC, dated May 7, 2010.  (Nahas Decl. Ex. 20.)  AIG's filing not only disclosed the counterparties from which it had obtained the securities, but also disclosed AIG's losses on particular transactions.  Additionally, a number of media outlets reported that AIG was preparing suits against several banks, including BoA, Morgan Stanley, Goldman Sachs, and Bear Stearns.  (SAC ¶ 91.)  These articles appeared in publications like The New York Times, Houston Chronicle, Baltimore Sun, Dow Jones Business News, and SNL Financial Services Daily.  (Nahas Decl. Exs. 9, 13, 14, 16, 18.)  Articles also appeared in the Asian and European versions of the Wall Street Journal, the National Post's Financial Post (Canada), and Calgary Herald.  (SAC ¶ 91; Nahas Decl. Exs. 10, 11, 12, 17.)  Each article specifically identified BoA as among those banks targeted by AIG.  (See, e.g., Nahas Decl. Ex 9 ("New York Times Article") at 1.)  The New York Times article stated that AIG was targeting four banks

11

and that BoA "ha[d] the largest exposure" to AIG's $40 billion in claims.  (New York Times Article at 2.)  The <u>National Post</u> reported that BoA's liability for claims like AIG's claims was approximately $30 billion.  (Nahas Decl. Ex. 12 at 199.)

On May 11, 2011, AIG disclosed that it had entered an agreement "tolling the statute of limitations in respect of certain claims AIG may have" against BoA Merrill Lynch.  (Nahas Decl. Ex. 21 at 1, S-35—36.)  AIG also disclosed tolling agreements with Goldman Sachs and J.P. Morgan, which had acquired Bear Stearns.  (Nahas Decl. Ex. 21 at 1, S-35—36.)  AIG has not initiated litigation against Goldman Sachs or J.P. Morgan.  (SAC ¶ 91.)

In July 2011, BoA and AIG participated in an unsuccessful mediation.  (SAC ¶ 104.)  BoA also hired new litigation counsel.  (SAC ¶ 108.)  On August 8, 2011, the end of the Class Period, AIG filed a complaint against BoA in New York State Supreme Court.  (SAC ¶¶ 112, 120.)  AIG raised fraud and securities claims based on BoA's sale of $28 billion in MBS to AIG between 2005 and 2007.  (SAC ¶¶ 7, 120.)  Although AIG sold many of its securities to the Federal Reserve Bank of New York, AIG maintains that it did not assign to the Federal Reserve various litigation rights, including the right to bring fraud and securities claims.  <u>See</u> <u>In re Countrywide Fin. Corp. Mortgage-</u>

12

backed Sec. Litig., -- F. Supp. 2d --, 2013 WL 1881567, at *2, 9
(C.D. Cal. May 6, 2013).

In its complaint, AIG sought as relief rescission of its
purchases of the disputed MBS, rescissory damages, or
compensatory damages equaling at least $10 billion, together
with punitive damages and other unspecified relief.  (SAC
¶ 120.)  On the day that AIG filed suit, BoA's stock fell 20%.
(SAC ¶ 15.)  Although many media outlets attributed the decline
to AIG's suit, (SAC ¶¶ 113-15, 117), the filing date coincided
with Standard & Poor's decision to downgrade the United States
Government's credit rating.  (SAC ¶ 143.)  The KBW Bank Index,
"a weighted index consisting of the stocks of 24 of the largest
banks in the United States," (SAC ¶ 144 n.56), declined by 10%
on news of the downgrade.  (SAC ¶ 144.)  The following day, the
KBW index rose 7% while shares of BoA rose 16.7%.  (Nahas Decl.
Ex. 32 at 8.)  Hence, in the two days following the announcement
of the AIG suit, BoA's stock dropped by a net 3.3% while the KBW
Bank Index dropped a net 3%.


### D.

The lead plaintiff in this putative class action suit is
Camcorp Interests Limited.  The Second Amended Complaint also
names as plaintiffs Alaska Electrical Pension Fund and Northern

Ireland Local Government Officers' Superannuation Committee. Together, these parties seek to represent those who purchased BoA common stock during the Class Period. They allege that the defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 by making materially misleading statements, and that the individual defendants violated Section 20 of the Exchange Act as control persons of BoA.

**E.**

The plaintiffs assert that the defendants were required to disclose the imminence and amount of the AIG suit to correct otherwise misleading statements about BoA's MBS exposure. The allegedly misleading statements fall into two categories: generalized risk warnings and specific statements about exposure to litigation. The plaintiffs allege that generalized warnings about BoA's exposure to MBS litigation appeared in BoA's Class Period filings with the SEC and created a duty to disclose the potential AIG suit. More particularly, the plaintiffs object to statements that BoA had significant and increasing exposure to litigation losses that were exacerbated by its acquisition of Countrywide and Merrill and had the potential to materially affect BoA's financial condition. (SAC ¶ 74.) The plaintiffs argue that these warnings were so broad and so vague that they

concealed the AIG suit and materially misled investors.  The
plaintiffs also allege that several specific statements
concerning particular MBS litigations and settlements, as well
as BoA's MBS exposure and its effect on profits, misled
investors by failing to disclose the imminence and amount of the
AIG suit.  The plaintiffs assert that the alleged omissions
rendered the defendants' specific representations misleading for
various reasons, including that the representations implied the
absence of the similar and material AIG suit and misrepresented
BoA's progress in addressing its exposure to MBS litigation.

In addition to alleging that the defendants had a duty to
disclose the imminence and amount of AIG's potential suit to
correct allegedly misleading statements, the plaintiffs assert
that the defendants were required to make the proffered
disclosures in order to comply with two regulatory provisions:
Accounting Standards Codification 450 ("ASC 450") and SEC
Regulation S-K 229.303 ("Item 303").  ASC 450 is a provision of
Generally Accepted Accounting Principles ("GAAP") that provides
accounting guidance for the accrual and disclosure of certain
loss contingencies.  (SAC ¶ 129.)  Item 303 is an SEC provision
that regulates the disclosure of known and material trends or
uncertainties.  (SAC ¶ 95.)

### III.

The defendants move to dismiss the claim for a violation of Section 10(b) and Rule 10b-5 because the plaintiffs have failed to allege material misstatements or omissions and scienter.

Section 10(b), as effectuated by Rule 10b-5, makes it "unlawful for any person . . . [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5(b).  To state a claim under Section 10(b) and Rule 10b-5, the plaintiffs must allege that the defendants, in connection with the purchase or sale of securities, made a materially false statement or omitted a material fact, with scienter, and that the plaintiffs' reliance on the defendants' action caused injury to the plaintiffs.  Ganino v. Citizens Utils. Co., 228 F.3d 154, 161 (2d Cir. 2000); see also City of Roseville, 814 F. Supp. 2d at 409.

The plaintiffs allege that the defendants failed to disclose the imminence and amount of the AIG suit and that this omission made BoA's disclosures about its litigation risk and the specific disclosures about particular risks false and misleading.  An alleged omission of fact is material if there is

16

"a substantial likelihood that disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." Basic, Inc. v. Levinson, 485 U.S. 224, 231–32 (1988) (citation and internal quotation marks omitted). "Put another way, a fact is to be considered material if there is a substantial likelihood that a reasonable person would consider it important in deciding whether to buy or sell shares of stock." Operating Local 649 Annuity Trust Fund v. Smith Barney Fund Mgmt. LLC, 595 F.3d 86, 92–93 (2d Cir. 2010) (citation and internal quotation marks and brackets omitted).

"A[n] omission is actionable under federal securities laws only when the [defendant] is subject to a duty to disclose the omitted facts." In re Time Warner Inc. Sec. Litig., 9 F.3d 259, 267 (2d Cir. 1993). Even though Rule 10b–5 imposes no duty to disclose all material, nonpublic information, once a party chooses to speak, it has a "duty to be both accurate and complete." Caiola v. Citibank, N.A., N.Y., 295 F.3d 312, 331 (2d Cir. 2002). "[A]n entirely truthful statement may provide a basis for liability if material omissions related to the content of the statement make it . . . materially misleading." In re Bristol Myers Squibb Co. Sec. Litig., 586 F. Supp. 2d 148, 160 (S.D.N.Y. 2008). However, corporations are "not required to

disclose a fact merely because a reasonable investor would very much like to know that fact." In re Optionable Sec. Litig., 577 F. Supp. 2d 681, 692 (S.D.N.Y. 2008) (quoting In re Time Warner Inc. Sec. Litig., 9 F.3d 259, 267 (2d Cir. 1993)); see also City of Roseville, 814 F. Supp. 2d at 410.


### A.

This case is about BoA's disclosure obligations with respect to a potential lawsuit by AIG against BoA based on BoA's sale of MBS to AIG. At the outset, the plaintiffs concede that the possibility of MBS litigation brought by AIG against BoA was publicly disclosed. (Pl.s' Mem. in Opp. to Def.s' Mot. to Dismiss ("Plaintiffs' Opposition") at 24.) The plaintiffs thus argue only that the defendants were required to disclose the imminence and amount of AIG's suit. (Plaintiffs' Opposition at 21 n.25, 24, 26.)

With respect to imminence, the plaintiffs allege, at most, that at some point during the Class Period it became probable that AIG would file its suit against BoA. With respect to amount, the plaintiffs allege that BoA failed to disclose the potential sum sought in the AIG suit for the duration of the Class Period. With respect to BoA's expected liability for the AIG suit, the plaintiffs allege only that a result adverse to

18

BoA was reasonably possible.  (Transcript of September 12, 2013 Oral Argument ("Tr.") at 23-24.)  Accordingly, the plaintiffs do not argue that BoA was required to accrue a reserve for the potential AIG litigation.  (Tr. at 23.)  Instead, the plaintiffs assert that the defendants should have disclosed a potential lawsuit that could have resulted in a loss of anywhere between zero and ten billion dollars.  (Plaintiffs' Opposition at 10.)

For the reasons explained below, the defendants were not required to disclose the alleged imminence of the AIG suit or the plaintiffs' expansive and indefinite loss range.  The disclosure that the plaintiffs demand was not required because that information was not materially different from the information that was already publicly disclosed, because the defendants' made no incomplete or inaccurate statements, and because no regulatory provision created an affirmative duty to disclose the allegedly omitted information.  The plaintiffs thus fail to allege actionable omissions under Rule 10b-5.

**B.**

The defendants argue correctly that the alleged omissions did not mislead investors because information about BoA's exposure to MBS litigation generally, and AIG's claim in particular, was in the public domain.

19

"Although the underlying philosophy of federal securities regulation is that of full disclosure, there is no duty to disclose information to one who reasonably should be aware of it." Seibert v. Sperry Rand Corp., 586 F.2d 949, 952 (2d Cir. 1978) (internal citations and quotation marks omitted). "Where allegedly undisclosed material information is in fact readily accessible in the public domain, . . . a defendant may not be held liable for failing to disclose this information." In re Keyspan Corp. Sec. Litig., 383 F. Supp. 2d 358, 377 (E.D.N.Y. 2003); see also In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig., 272 F. Supp. 2d 243, 249-250 (S.D.N.Y. 2003) ("[T]he Defendants cannot be held liable for failing to disclose . . . publicly available information.").

In this case, the plaintiffs allege only that AIG was "considering" a suit, "planned" to sue, or would probably sue. (SAC ¶¶ 58, 63, 108.) These probabilities were plainly within the public domain because, as the plaintiffs acknowledge, The New York Times disclosed on April 27, 2010 that AIG was preparing lawsuits against BoA and several other banks that allegedly made misstatements in creating MBS. (Plaintiffs' Opposition at 24.) Similar information was also republished, nationally and internationally, in publications like the Houston

20

Chronicle, Wall Street Journal, and Dow Jones Business News, and was thus readily accessible to a reasonable investor.

The potential amount of AIG's suit against BoA was also well within the public domain. The April 27, 2010 New York Times article estimated AIG's total MBS claims at $40 billion, stated that AIG was preparing suits against four banks, and stated that BoA had the largest exposure, thus communicating to the market that BoA's potential exposure to AIG's MBS claims was at least $10 billion. Moreover, it is undisputed that AIG disclosed before the Class Period a precise breakdown of most of the securities at issue in the potential AIG suit. AIG's published breakdown disclosed both the parties from whom AIG had purchased the securities and AIG's losses on particular transactions. Accordingly, AIG made publicly available the exact information that investors needed to evaluate the scope of BoA's liability to AIG.

The plaintiffs rely on In re Bank of Am. Corp. Sec., Derivative, & ERISA Litig., to argue that these public disclosures were insufficient because disclosures "must be communicated with a degree of intensity and credibility sufficient to counter-balance effectively any misleading information created by the alleged misstatements." 757 F. Supp. 2d 260, 302 (S.D.N.Y. 2010). The plaintiffs' reliance on In re

21

Bank of Am. Corp. is misplaced because that case pertained to
affirmative misstatements.  Id. at 301.  In this case, the
plaintiffs do not allege any affirmative misstatement but rather
allege that there were omissions in the defendants' public
disclosures.  BoA did not lull investors into believing that AIG
would not pursue a lawsuit against it.  Accordingly, this is not
a case where prior misstatements had to be corrected with the
same intensity and credibility as the original misstatements.

The plaintiffs also argue that the public disclosures at
issue are less robust and thus distinguishable from those found
sufficient to defeat a duty to disclose in previous cases.  See
e.g., In re KeySpan Corp. Sec. Litig., 383 F. Supp. 2d at 376-77
(finding public disclosure adequate where relevant information
appeared in two of company's publicly filed documents).  This
asserted distinction is unpersuasive because the plaintiffs have
not adequately explained what more was necessary to supplement
the material already in the public domain.  The plaintiffs
concede that investors were aware of the New York Times article
and that similar information was disseminated in several
additional national and international media outlets.
(Plaintiffs' Opposition at 24, 26 n.29.)  No reasonable investor
could have been aware of these public disclosures and ignorant
of the potential imminence and amount of the AIG suit because

the salient details of the potential litigation were encompassed by what was communicated to the market, namely, that AIG was preparing a suit against BoA on the magnitude of $10 billion. Reasonable investors thus had ready access to the very information that the plaintiffs assert should have been disclosed and the defendants are not liable for failing to reiterate that information.  Seibert v. Sperry Rand Corp., 586 F.2d at 952; see also In re Keyspan Corp., 383 F. Supp. 2d at 377 ("Even at the pleading stage, dismissal is appropriate where the complaint is premised on the nondisclosure of information that was actually disclosed.").  Because the substance of the alleged omissions was already in the public domain, the alleged omissions could not have altered "the total mix of information available" to the public and were also immaterial as a matter of law.  Basic, 485 U.S. at 231-32.

Moreover, the disclosure of the imminence and amount of the potential AIG suit could not have altered the "total mix of information" available to BoA investors because that potential lawsuit was only one piece of the potential litigation BoA faced as a result of its exposure to the MBS market.  The magnitude and risk of that potential exposure was extensively disclosed. BoA disclosed that, between 2004 and 2008, it and its subsidiaries had originated and securitized $2.1 trillion in

23

MBS, $963 billion of which were sold to private investors.  In its 2010 Annual Report, BoA disclosed that the mortgages underlying $216 billion of those private label MBS were either in default or severely delinquent.  As part of its risk disclosure with respect to its mortgage and housing market-related risks, BoA disclosed in its 2010 Annual Report, at the beginning of the Class Period, that: "We face substantial potential legal liability and significant regulatory action, which could have material adverse effects on our cash flows, financial condition, and results of operations, or cause significant reputational harm to us."  (Annual Report at 16.) The Annual Report also made it clear that the "volume of claims and amount of damages and penalties claimed in litigation and regulatory proceedings against us and other financial institutions remain high and are increasing."  Id.  Investors thus knew the scope of BoA's potential MBS liabilities and the risks associated with those liabilities.

The plaintiffs' Second Amended Complaint is replete with references to BoA's publicly disclosed exposure to MBS litigation.  (See, e.g., SAC ¶ 51, 81, 96.)  The Second Amended Complaint states that the collateral supporting MBS was decimated between 2006 and 2009, with the consequence that BoA "faced extensive liability from its own actions, as well as

24

those of Countrywide and Merrill Lynch." (SAC ¶ 35.)   The

Second Amended Complaint also states that by 2010 "investors

were increasingly suing banks," including BoA, for their

involvement in the MBS market. (SAC ¶ 4.)   For that

proposition, the plaintiffs rely on a report published by an

independent federal commission and released to the public before

the Class Period. (SAC ¶ 4 n.2.)   The plaintiffs have thus

pleaded that BoA's potential exposure to MBS claims was

prominently in the public domain without explaining why the

amount of any one claim was of consequence to investors.

Because alleged omissions must be evaluated by considering

representations and omissions "together and in context," the

overwhelming disclosure concerning BoA's broad exposure to MBS

litigation renders the alleged omissions immaterial to a

reasonable investor. Halperin v. eBanker USA.com, Inc., 295

F.3d 352, 357 (2d Cir. 2002).   That the market did not react to

The New York Times' disclosure of AIG's potential $10 billion

suit against BoA underscores that no reasonable investor would

have considered such information material when purchasing stock

in BoA.[2]   In light of the considerable disclosures regarding

BoA's liability for MBS claims generally, and the particular

---

[2] BoA's stock in fact rose slightly on both April 27, 2011 and
April 28, 2011. (Def.s' Mot. in Supp. of Def. Mot. to Dismiss
at 10.)

public information about the potential imminence and amount of
the AIG suit, the demanded disclosures could not have altered
the total mix of public information and are immaterial as a
matter of law.  Basic, 485 U.S. at 231-32.[3]

c.

The plaintiffs argue that BoA's risk disclosures, including
some of its particular statements, were materially misleading

---

[3] The plaintiffs contend that the alleged omissions were
quantitatively material because BoA's potential $10 billion loss
exceeded its net income in fiscal years 2008 through 2010.  The
plaintiffs do not allege that any qualitative factors support
materiality.  See Litwin v. Blackstone Group, L.P., 634 F.3d
706, 717 (2d Cir. 2011) (holding that courts must analyze all
relevant qualitative and quantitative factors in assessing
materiality).  The plaintiffs' claim fails on many levels.
First, the potential liability to AIG was part of the potential
risk from its enormous sales of MBS, a significant part of which
were in default or severely delinquent and that was in fact
disclosed.  Moreover, the plaintiffs fail to compare the AIG
suit to a like term on BoA's financial statements.  The
plaintiffs concede that BoA was not required to accrue a $10
billion reserve for the AIG suit and acknowledge that BoA's
liability for the claim could range from zero to ten billion
dollars.  Given that the upper limit of this loss range is
purely speculative, it cannot properly be compared to net income
to establish quantitative materiality.  See Ganino, 228 F.3d at
165 ("[I]tems in issue should be compared to like items on the
corporate financial statement.").  Moreover, the plaintiffs do
not identify any other item on BoA's financial statements to
which BoA's potential loss from threatened litigation could be
compared.  The plaintiffs therefore fail to contextualize the
AIG suit, which precludes any finding that the proposed
disclosures were material based on the potential upper limit of
the ad damnum clause of a possible claim.  See ECA Local 134
IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co., 553
F.3d 187, 204 (2d Cir. 2009).

because they failed to disclose the imminence and amount of the potential AIG suit.  However, BoA's truthful disclosures were not rendered materially misleading by the alleged omissions.

The broad statements to which the plaintiffs object were made in BoA's public filings.  First, BoA cautioned that the "volume of claims and amount of damages and penalties claimed in litigation and regulatory proceedings against us and other financial institutions remains high and are increasing."  (SAC ¶ 74.)  BoA then explained that it "and its subsidiaries are routinely defendants in or parties to many pending or threatened legal actions and proceedings" and that "these litigation and regulatory matters and any related settlements could have a material adverse effect on [BoA's] cash flows, financial conditions and results of operations."  (SAC ¶ 74.)  Finally, BoA noted that it continued "to face increased litigation risk and regulatory scrutiny as a result of the Countrywide and Merrill Lynch acquisitions."  (SAC ¶ 74.)

According to the plaintiffs, these and other risk disclosures in BoA's public filings misled investors because they concealed the AIG suit.  This claim is without merit.  As an initial matter, the risk disclosures could not have misled a reasonable investor into thinking that risks like the AIG suit did not exist in light of information communicated to the market

about BoA's exposure to MBS litigation generally and to the AIG specifically. Halperin, 295 F.3d at 359 (a generic disclaimer contains actionable omissions if it can mislead a reasonable investor "into thinking that the risk that materialized and resulted in his loss did not actually exist"). In any event, where there is disclosure that is broad enough to cover a specific risk, the disclosure is not misleading simply because it fails to discuss the specific risk. Hunt v. Alliance N. Am. Gov't Income Trust, Inc., 159 F.3d 723, 730-31 (2d Cir. 1998). This is particularly so when there is ample disclosure of the broader risk. Id. at 731. In Hunt, the Court of Appeals held that the general disclosure that a fund would invest in "government guaranteed mortgage-related securities" was sufficient to cover investments in "collateralized mortgage obligations," particularly in view of the extensive disclosure about the mortgage-related instruments that the fund purchased. Id. at 730-31.

In this case, no reasonable investor could have read BoA's extensive risk disclosures as negating the possibility that litigants would file suits such as the AIG suit. The possibility of such increasing litigation was explicitly disclosed, as was the fact that lawsuits could have a material adverse effect on BoA's financial condition. The extensive

28

disclosures discussed above, see supra Part II(B), could not have misled a reasonable investor into believing that AIG would not sue BoA.  Moreover, BoA made clear that its accruals reflected only probable and estimable litigation losses and that the disclosed amount by which its losses could exceed accruals did not include "those matters for which an estimate is not possible."  (Annual Report at 196; see also SAC ¶ 71.)  Because no investor could read these disclosures without understanding that indeterminate potential losses, like the AIG suit, were not disclosed in BoA's public filings but could later materialize, the defendants had no duty to say more.  See In re Proshares Trust Sec. Litig., 728 F.3d 96, 103 (2d Cir. 2013) ("Disclosure is not a rite of confession or exercise in common law pleading.").  Taken together and in context, the disclosures that BoA made would not have misled a reasonable investor.  See Hunt, 159 F.3d at 731.

The plaintiffs maintain that the defendants extensive risk disclosures were misleading because they concealed an actualized risk.  It is true that "[i]f a party is aware of an actual danger or cause for concern, the party may not rely on a generic disclaimer in order to avoid liability."  Edison Fund v. Cogent Inv. Strategies Fund, Ltd., 551 F. Supp. 2d 210, 226 (S.D.N.Y 2008).  However, the risk of the AIG suit was adequately

subsumed in the disclosures with respect to the increasing risks
of litigation that could have a material adverse effect on BoA's
financial condition.  Although that risk became an actual danger
to BoA when the AIG suit was in fact filed, that event was
promptly disclosed, and it ended the Class Period on August 8,
2011.  Prior to that time, BoA could not determine that the
lawsuit would in fact be filed.  The Second Amended Complaint
alleges that BoA participated in an unsuccessful mediation as
late as July 2011 (SAC ¶ 104), and AIG never filed a lawsuit
against several other firms with which it had tolling
agreements.  The timing of any lawsuit was completely in the
control of AIG.  And even after the lawsuit was filed, the
plaintiffs allege no more than that the potential loss was
somewhere between zero and ten billion dollars.  The general
risk disclosures were not rendered misleading by the failure to
include a disclosure about a lawsuit that could be filed at an
uncertain date seeking damages that could not be estimated.

     The plaintiffs next assert that several specific statements
about BoA's MBS exposure were rendered misleading by the
defendants' failure to disclose the imminence and amount of the
AIG suit.  The relevant statements were made during the Class
Period and fall into two general categories: representations
about particular litigations or settlements and representations

30

about BoA's MBS exposure and the effect of MBS exposure on
profits.  None of the statements were misleading.  The
statements are listed below.

1. BoA's Annual Report was filed on February 25, 2011 and
   stated that BoA was party to particular fraud and
   securities matters similar to the AIG suit.  (SAC Section
   V.A., ¶ 81.)

2. Moynihan stated at a March 8, 2011 investor conference that
   BoA had "brought down the legacy risk left over from the
   financial crisis" and "continued to reduce legacy risks"
   from the financial crisis.  (SAC ¶ 80.)  He made similar
   representations on BoA's 2011 first quarter earnings call
   and also communicated quantitative predictions about BoA's
   exposure to representation and warranty claims.  (SAC
   ¶¶ 88-89.)

3. BoA's 2011 first quarter report filed on May 5, 2011 stated
   that reduced net income resulted from "higher mortgage-
   related costs and material litigation expenses."  (SAC
   ¶ 92.)  Additionally, the filing included a section
   disclosing risks associated with "Representation and
   Warranties and Other Mortgage-related Matters."  (SAC
   ¶ 92.)

4. BoA published a press release on June 29, 2011, which
   stated that BoA had reached an $8.5 billion settlement
   regarding representation and warranty claims raised by
   private investors with the Gibbs Group.  (SAC ¶ 96.)  The
   Form 8-K accompanying the press release also stated that
   BoA was "not able to determine whether any additional
   securities law or fraud claims will be made by investors"
   in trusts covered by the settlement, that "various
   investors" were already pursuing securities law or fraud
   claims against BoA, and that the Bank could not "reasonably
   estimate the amount of losses, if any" that would result
   from asserted or potential securities claims. (SAC ¶ 96.)

5. On a June 29, 2011 phone call with analysts, Moynihan and
   Thompson repeated statements made in the Gibbs Group press
   release.  Thompson also stated that BoA had "made a lot of
   progress in putting the legacy issues behind us."  (SAC
   ¶ 100.)  Thompson explicitly noted that the Gibbs Group

settlement applied only to Countrywide and Bank of New York
as trustee, and therefore did not "cover loans that were
sold by other BAC entities into private label trusts . . .
[or] sold to third parties and subsequently repackaged into
private MBS trusts." (SAC ¶ 100.)  Thompson added that the
settlement was inapplicable to "investor securities claims
that are either out there or were to arise." (SAC ¶ 100.)

6. On a July 19, 2011 earnings call and in a July 19, 2011
   press release, the defendants represented that BoA's second
   quarter net income had declined from previous years because
   BoA had incurred costs settling Countrywide's repurchase
   exposure, that BoA continued to make progress on legacy
   risks, and that BoA had only $1.7 billion in exposure to
   particular private representation and warranty claims.
   (SAC ¶¶ 105-107.)

7. BoA's 2011 second quarter report was filed on August 4,
   2011 and identified risks associated with particular
   "Litigation and Regulatory Matters" or "Other Mortgage
   Related Matters." (SAC ¶ 108.)  The filing stated that BoA
   could not "determine whether any additional securities law
   or fraud claims will be made by investors" and did not
   identify the AIG suit.  (SAC ¶ 108.)

8. Defendants Moynihan and Thompson signed Sarbanes-Oxley
   certifications on each of BoA's SEC filings during the
   Class Period.  (SAC ¶¶ 76, 94, 111.)  The certifications
   stated that BoA's financial statements did not contain
   untrue statements or material omissions and stated that
   BoA's internal control system brought relevant financial
   concerns to the signatories' attention.  (SAC ¶ 76.)

9. BoA's Class Period reports to the SEC also stated that the
   Bank disclosed loss contingencies in accordance with
   Generally Accepted Accounting Principles.  (SAC ¶¶ 70, 73,
   92, 110.)

    With respect to representations about particular

litigations or settlements, the plaintiffs argue that BoA's

public filings misled investors by disclosing matters that,

though similar to the AIG suit, involved materially smaller

losses.  This claim fails because a corporation is not required
to reveal all facts on a subject just because it reveals a
single fact.  See In re Sanofi-Aventis Sec. Litig., 774 F. Supp.
2d 549, 561 (S.D.N.Y. 2011).  There is an obvious difference
between an actual lawsuit and threatened litigation that has not
been brought.  No reasonable investor would believe that
disclosures of pending litigation meant that no other
litigations were possible.  Accordingly, the defendants'
truthful disclosures regarding pending litigations and recent
settlements were not rendered incomplete or inaccurate by their
failure to make disclosures about threatened litigation,
particularly a threatened litigation with a loss range as
indeterminate as the AIG suit.  This is especially so because
BoA was careful to note that particular litigations and
settlements did not preclude additional fraud or securities
claims.  For example, the defendants qualified their
announcement of the Gibbs Group settlement by noting first that
the settlement did not cover "the investor securities claims
that are either out there or were to arise" and then that
"various investors, including certain members of the Investor
Group, are pursuing securities law or fraud claims related to
one or more of the Covered Trusts."  (SAC ¶¶ 96, 100.)

With respect to statements about BoA's remaining MBS exposure and its effect on profits, the plaintiffs argue that the failure to disclose the imminence and amount of the AIG suit misled investors by concealing a potentially substantial loss that would have placed in a different light each of the relevant statements.  This claim is also without merit.  The particulars of the potential AIG suit were known to the market and thus allowed investors to evaluate the defendant's statements. Further, BoA disclosed that $216 billion of the private label MBS securitized by BoA and its subsidiaries were either in default or delinquent, therefore placing the relevant statements in proper context.  In light of the information to which investors had access the defendants had no duty to supplement their truthful disclosures about MBS litigation risk or its effect on profitability.  See In re Optionable Sec. Litig., 577 F. Supp. 2d at 692 (a corporation is "not required to disclose a fact merely because a reasonable investor would very much like to know that fact").

Additionally, several of the statements upon which the plaintiffs rely in alleging actionable omissions pertain to representation and warranty claims. (See, e.g., SAC ¶¶ 80, 88-89, 92, 96, 105.)  These statements cannot have misled reasonable investors because representation and warranty claims

34

involve contractual rights to demand unique remedies and are thus readily distinguishable from AIG's potential fraud and securities claims.  Further, the defendants carefully differentiated representation and warranty claims from fraud and securities claims in their public statements.  For example, when announcing the Gibbs Group settlement, the defendants noted that the settlement "[did] not release investors' securities law or fraud claims."  (SAC ¶ 76.)  Further, the defendants warned investors that BoA could not "determine whether any additional securities law or fraud claims will be made by investors" in the trusts covered by the settlement.  (SAC ¶ 96.)  Similarly, BoA distinguished between representation and warranty claims and fraud and securities claims in its public filings, separately disclosing its liability for each type of action.  (Compare Annual Report at 9, 52, with Annual Report at 196, 201-02.) The plaintiffs concede that AIG's claims are not representation and warranty claims.  (SAC ¶ 81.)  Therefore, statements about representation and warranty claims could not have misled investors about the imminence and amount of the potential AIG fraud and securities suit.

Taken together and in context, the defendants' truthful statements about MBS litigation were not rendered misleading by the failure to include a disclosure about the potential AIG

suit.  See, e.g., Richman v. Goldman Sachs Grp., 868 F. Supp. 2d
261, 274 (S.D.N.Y. 2012).[4]


**D.**

The plaintiffs argue that BoA was required to disclose the
potential AIG suit under ASC 450.  The defendants argue
correctly that there was no such requirement.

ASC 450 provides guidance regarding the accrual and
disclosure of loss contingencies, which are defined as
conditions, situations, or circumstances "involving uncertainty
as to possible loss . . . that will ultimately be resolved when
one or more future events occur or fail to occur."  ASC ¶ 450-
20-20 Glossary.  Under ASC 450, loss contingencies must be
accrued when information available before financial statements
are issued suggests that a loss contingency is probable and can
be reasonably estimated.  ASC ¶ 450-20-25.  When accrual is not
required, a loss contingency must be disclosed if it is

---

[4] The plaintiffs also allege that Defendants Moynihan and
Thompson made misstatements when they signed Sarbanes-Oxley
certifications assuring investors that financial statements did
not contain untrue statements or material omissions, and allege
that various filings submitted to the SEC were false or
misleading for asserting compliance with GAAP.  For the reasons
explained above, the plaintiffs have failed to allege that BoA's
financial statements contained untrue statements or material
omissions and therefore have failed to plead sufficiently that
the Sarbanes-Oxley certifications were false or misleading. The
plaintiffs have also insufficiently alleged any violations of
GAAP.  See infra Part III(D).

reasonably possible; that is, if the likelihood that it will occur is more than remote but less than likely.  ASC ¶¶ 450-20-50-3; 450-20-20 Glossary.  Disclosure of reasonably possible losses must include "the nature of the contingency" and an estimate of the loss or range of loss.  ASC ¶ 450-20-50-4.  If a loss cannot be estimated, the entity may state that an "estimate cannot be made."  ASC ¶ 450-20-50-4.

Under ASC 450, threatened litigation may qualify as a loss contingency when the potential claimant has manifested awareness of the claim.  See ASC ¶ 450-20-50-6.  Three factors are relevant in determining whether threatened litigation constitutes a qualifying loss contingency subject to accrual or disclosure: 1) when the cause of action arose[5]; 2) the degree of probability of an unfavorable outcome; and, 3) the ability to make a reasonable estimate of loss.  ASC ¶ 450-20-55-10.

In this case, the plaintiffs do not allege that litigation was probable and accrual required.  Rather, the plaintiffs allege that the AIG suit was a reasonably possible loss contingency that had to be disclosed with particularity.  The plaintiffs make several allegations in support of this position.  The Second Amended Complaint states that BoA knew that BoA,

---

[5] When AIG's cause of action arose has no bearing on the disposition of this case.

37

Countrywide, and Merrill Lynch had used inadequate underwriting standards to create the securities sold to AIG and that BoA had settled suits like the AIG suit.  It is undisputed that BoA and AIG attempted, unsuccessfully, to mediate their dispute.

Whatever the merits of the allegations that BoA should have known some liability to AIG was reasonably possible, there is no plausible allegation that BoA could have reasonably estimated the amount of loss.  The plaintiffs admit as much in arguing that BoA was required to disclose a potential loss of zero to ten billion dollars.  Such an expansive loss range is unreasonable and requiring that BoA disclose it would render this provision of GAAP meaningless.  Accordingly, the AIG suit was not a qualifying loss contingency subject to disclosure under ASC 450.

In any event, the plaintiffs fail to allege a violation of ASC 450 because BoA adequately disclosed the nature of the contingency at issue—namely, loss from pending and threatened litigation arising from the sales of MBS—and stated that it could not estimate losses for certain litigations that would have included the AIG suit.  Moreover, BoA acknowledged that its exposure to such litigation could have a material adverse effect on BoA's financial condition.  With respect to estimating loss, it is undisputed that BoA did not include the AIG suit in its

estimated range of possible loss over accruals for matters where
an estimate is possible.  However, it is equally clear that BoA
was not required to include the AIG suit in that loss range.
ASC 450 requires only either a loss estimate or a statement that
an estimate cannot be made.  BoA stated that, "[f]or some
matters for which a loss is probable or reasonably possible,
such an estimate is not possible."  (SAC ¶ 71.)  This disclosure
captured the potential AIG suit because BoA's exposure to the
AIG suit was inestimable.  The plaintiffs concede as much by
acknowledging that the loss range was ten billion dollars and
that the loss could be as little as zero.  The plaintiffs supply
no authority in support of their argument that ASC 450 requires
greater particularity than BoA provided.


                                E.

     The plaintiffs also argue that the defendants were obliged
to disclose the imminence and amount of the AIG suit under Item
303.  However, no such disclosure was required under Item 303
because the imminence and amount of AIG's suit were
insufficiently certain.  Item 303 requires that companies
disclose "any known trends . . . or uncertainties that will
result in or that are reasonably likely" to have a material

                                39

effect on liquidity.  17 C.F.R. § 229.303(a)(1).  "[T]he
Regulation imposes a disclosure duty where a trend, demand,
commitment, event or uncertainty is both [1] presently known to
management and [2] reasonably likely to have material effects on
the registrant's financial condition or results of operations."
Panther Partners Inc. v. Ikanos Commc'ns, Inc., 681 F.3d at 120
(internal quotation marks omitted).

        As an initial matter, the plaintiffs' Item 303 claim fails
because the Second Amended Complaint contains no allegation that
the eventual filing of the AIG suit was ever presently known to
BoA management, as Item 303 requires.  See Panther Partners, 681
F.3d at 120 (finding sufficient knowledge where company knew
that it would have to accept returns of all product or else take
substantial action).  However, the plaintiffs Item 303 claim
also fails because the plaintiffs have not sufficiently alleged
that the AIG suit was "reasonably likely" to generate any loss,
let alone a material loss.  The plaintiffs allege that the
likelihood that BoA would incur losses as a result of the AIG
suit was "reasonably possible," "at least reasonably possible,"[6]
or "more than 'reasonably possible.'"  (SAC ¶¶ 63, 162, 211.)

_____

[6] Referring to the Glossary of ASC 450, the plaintiffs
specifically note that "reasonably possible" means that the
"chance of the future event happening is more than remote, but
less than likely."  (SAC ¶ 162 n.60) (emphasis added).

The plaintiffs do not allege that a loss was likely enough to require accrual.  Moreover, the plaintiffs' proffered loss range of zero to ten billion dollars means that it could not be determined that any loss would ever be material.[7]

Because the plaintiffs have failed to allege any material misstatement or omission, their claim for a violation of Section 10(b) and Rule 10b-5 must be **dismissed**.

**IV.**

The defendants argue that the claim under Section 10(b) and Rule 10b-5 should also be dismissed because the plaintiffs have not alleged sufficient facts to support a strong inference of scienter.  The scienter required to support a securities fraud claim can be "intent to deceive, manipulate, or defraud, or at least knowing misconduct."  SEC v. First Jersey Sec., Inc., 101 F.3d 1450, 1467 (2d Cir. 1996) (internal citations omitted).

---

[7] The defendants also argue that Item 303 is not applicable in this case because S-K 229.103 ("Item 103") forecloses any obligation to disclose threatened litigation under Item 303. Item 103 provides for the disclosure of "material pending legal proceedings," and similar information with respect to "proceedings known to be contemplated by government authorities."  Item 103 provides an exclusion for legal proceedings involving primarily a claim of damages if the amount sought, exclusive of interest and costs, does not exceed ten percent of the current assets of the company and its subsidiaries on a consolidated basis.  The defendants argue that because the potential AIG suit would not satisfy this disclosure requirement, which is more directly on point for litigation, Item 303 should not be held to apply.  It is unnecessary to reach this argument.

The PSLRA requires that a complaint alleging securities fraud
"state with particularity facts giving rise to a strong
inference that the defendant[s] acted with the required state of
mind." 15 U.S.C. § 78u-4(b)(2). Scienter may be inferred from
(i) facts showing that a defendant had "both motive and
opportunity to commit the fraud," or (ii) facts that constitute
"strong circumstantial evidence of conscious misbehavior or
recklessness." ATSI, 493 F.3d at 99; see also City of
Roseville, 814 F. Supp. 2d at 418-19.

      In this case, the plaintiffs do not allege scienter on
motive and opportunity grounds. There is no allegation that the
defendants, who collectively owned 883,651 shares of BoA stock
during the Class Period, (Nahas Decl. Ex. 31), sold a single
share of BoA stock during the Class Period. There is also no
allegation that that the defendants possessed any other concrete
and personal motive to defraud BoA investors by concealing the
AIG suit.[8]  Instead, the plaintiffs assert that the Second
Amended Complaint states facts constituting strong

---

[8] Although the plaintiffs originally argued that the defendants
had a motive to conceal the AIG suit in order to raise capital,
(SAC ¶ 212), the plaintiffs have abandoned that argument. (See
Plaintiffs' Opposition at 29-40.)  The decision to do so is
unsurprising because the alleged motive to raise capital is a
generic one insufficient to support scienter. See, e.g., In re
DRDGold Ltd. Sec. Litig., 472 F. Supp. 2d 562, 570 (S.D.N.Y.
2007) (collecting cases).

circumstantial evidence of conscious misbehavior or recklessness. Where, as here, motive is not apparent, "the strength of the circumstantial allegations must be correspondingly greater." Kalnit v. Eichler, 264 F.3d 131, 142 (2d Cir. 2001) (internal quotation marks omitted).

Plaintiffs typically allege conscious misbehavior or recklessness by pleading with specificity that the defendants had "knowledge of facts or access to information contradicting their public statements." Novak v. Kosaks, 216 F.3d 300, 308 (2d Cir. 2000). As the Second Circuit Court of Appeals has explained, "[r]eckless conduct is, at the least, conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care . . . to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." Chill v. Gen. Elec. Co., 101 F.3d 263, 269 (2d Cir. 1996) (alteration in original and internal quotation marks omitted).

The facts must support a strong inference with regard to each defendant. See Plumbers and Pipefitters Local Union No. 630 Pension-Annuity Trust Fund v. Arbitron Inc., 741 F. Supp. 2d 474, 488 (S.D.N.Y. 2010). Further, "in determining whether the pleaded facts give rise to a 'strong' inference of scienter, the court must take into account plausible opposing inferences."

43

Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 323
(2007).  A complaint sufficiently alleges scienter when "a
reasonable person would deem the inference of scienter cogent
and at least as compelling as any opposing inference one could
draw from the facts alleged."  Id. at 324; ATSI, 493 F.3d 87, 99
(2d Cir. 2007).  Because the plaintiffs allege fraudulent
omissions, rather than false statements, "it is especially
important to rigorously apply the standard for pleading intent."
In re GeoPharma, Inc. Sec. Litig., 411 F. Supp. 2d 434, 437
(S.D.N.Y. 2007).

The Second Amended Complaint does not sufficiently allege
that the defendants acted with reckless disregard for a known or
obvious duty.  Several factors, including third party disclosure
of relevant information, BoA's own disclosures, and BoA's
apparent compliance with relevant regulatory provisions, support
an inference against scienter that is far stronger than the
competing inference that the plaintiffs' suggest.

The public domain contained media reports that disclosed
the probability of AIG's suit and its approximate amount.
Additionally, AIG published a precise breakdown of its MBS
portfolio, complete with counterparties and losses.  The
market's access to this information about the AIG suit supports
a compelling inference that any failure to disclose occurred

because the defendants reasonably believed that no further disclosure was required.  See White v. H&R Block, Inc., No. 02 Civ. 8965, 2004 WL 1698628, *9 (S.D.N.Y. July 28, 2004) (finding it reasonable for defendants to believe that investing public was well aware of public disclosures pertaining to alleged omissions).

Indeed, the plaintiffs concede that "reasonable minds could differ on whether AIG's claim was already sufficiently disclosed." (Plaintiffs' Opposition at 24.)  This admission precludes scienter because reckless conduct must be "highly unreasonable" and constitute "an extreme departure from ordinary standards of care."  Chill, 101 F.3d at 269 (emphasis added).

BoA's general and categorical public disclosures also weigh heavily against an inference of scienter.  In plain terms, BoA cautioned investors that it faced substantial and rising litigation risks that were exacerbated by the acquisitions of Countrywide and Merrill and could materially affect BoA's financial condition.  Narrower categorical disclosures identified BoA's exposure to the precise claims that AIG eventually raised and warned investors that BoA could not estimate losses for all probable or reasonably possible litigations.  (Annual Report at 201.)  In light of these disclosures, the defendants could reasonably believe that they

45

had no duty to say more, especially given that public
disclosures do not need to encompass precisely those facts
allegedly omitted from a defendant's statements.  See UBS AG
Sec. Litig., No. 07 Civ. 11225, 2012 WL 4471265, at *15
(S.D.N.Y. Sept. 28, 2012) (finding failure to disclose precise
breakdown of MBS portfolio insufficient to support scienter in
part because market knew company's MBS portfolio was large).

     The plaintiffs argue that a strong inference of scienter
arises because BoA willfully neglected SEC instructions
regarding its disclosure obligations.  This claim is not
persuasive because it mischaracterizes the correspondence
between BoA and the SEC, which reveals that BoA was responsive
to SEC concerns about BoA's disclosures.  For example, in
response to SEC comments, BoA provided in an aggregate amount a
range of possible loss for estimable losses in excess of
accruals.  (Compare Garvey Decl. Ex. 6 ("SEC Letter of May
2010"), with Annual Report at 196.)  The plaintiffs fail to
point to any SEC complaints with this level of disclosure or any
complaint that could be viewed as a regulatory requirement to
disclose the potential AIG suit.  Indeed, the Second Amended
Complaint affirmatively pleads that in January, 2011, BoA
explained to the SEC why its disclosures with respect to
aggregate losses in excess of accruals was adequate.  (SAC

¶ 176.)  The SAC fails to plead that the SEC objected in any way or required any further disclosure.  BoA's record of accommodation renders implausible the plaintiffs' assertion that the Bank was willfully ignoring its regulator.

The plaintiffs' remaining arguments in support of scienter are also without merit.  The plaintiffs' assertion that the defendants committed an obvious regulatory violation is unpersuasive because the plaintiffs have not sufficiently alleged a violation of either ASC 450 or Item 303.  Having failed to allege a duty to disclose under either provision, the plaintiffs cannot turn to those provisions to establish scienter.  See Kalnit, 264 F.3d at 143 (because "the duty to disclose . . . was not so clear . . . defendants' recklessness cannot be inferred from the failure to disclose.").

The plaintiffs' assertion that BoA's knowledge of the deficient underwriting practices used to create securities it sold to AIG is also insufficient to support scienter.  The parties do not dispute that the defendants knew BoA might incur losses based on its sale of MBS to AIG.  However, BoA and AIG attempted through a tolling agreement to settle AIG's claims and avoid litigation.  Further, BoA and AIG attempted to mediate AIG's claims to avoid litigation.  The plaintiffs have not pleaded any facts suggesting that the defendants knew, while

47

settlement negotiations were ongoing, that litigation was imminent or that the amount of AIG's eventual suit was estimable.  The plaintiffs merely assert that the defendants "should have anticipated future events and made certain disclosures earlier than they actually did." Edison, 551 F. Supp. 2d at 228 (quoting Novak, 216 F.3d at 308).  Such assertions "do not suffice to make out a claim of securities fraud." Id.

Viewed holistically, the allegations in the Second Amended Complaint do not support a cogent inference that the defendants' conduct was highly unreasonable and violative of a known or obvious duty.  The much more compelling conclusion is that the defendants did not think that there was any need for public disclosure in view of the information already in the marketplace, the aggregate disclosure in BoA's filings, and the lack of any definitive regulatory requirement requiring the disclosure of a possible lawsuit of indeterminate amount. See In re Hardinge, Inc. Sec. Litig., 696 F. Supp. 2d 309, 332 (W.D.N.Y. 2010) ("[T]he most likely inference from the facts alleged is that defendants did not make certain disclosures . . . because they believed that they were under no obligation to do so . . . .").  Accordingly, the plaintiffs have not alleged particular facts supporting a strong inference of

scienter with respect to any individual defendant, as the PSLRA requires.  Because the plaintiffs also fail to show that any individual whose intent can be imputed to BoA acted with scienter, the plaintiffs have also failed to plead scienter with respect to BoA.  Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc., 531 F.3d 190, 195 (2d Cir. 2008). Accordingly, the plaintiffs have failed to allege scienter with respect to any defendant and their claim pursuant to Section 10(b) and Rule 10b-5 claim must also be **dismissed** on this basis.[9]

### V.

The plaintiffs also allege that the individual defendants are liable under Section 20(a) of the Exchange Act, which provides:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable . . . unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

---

[9] While the defendants also allege that the plaintiffs have failed to allege loss causation, it is unnecessary to reach that argument.

15 U.S.C. § 78t(a).  "To establish a prima facie case of control person liability, a plaintiff must show (1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud."  ATSI, 493 F.3d at 108.  In this case, the plaintiffs have not alleged a primary violation of Section 10(b) and Rule 10b-5.  Accordingly, the plaintiffs have not satisfied the first element of a Section 20(a) claim, and that claim must also be **dismissed.**

## CONCLUSION

The Court has considered all the remaining arguments of the parties.  To the extent not specifically addressed above, they are either moot or without merit.  For the foregoing reasons, the defendants' motion to dismiss is **granted.**  The Clerk is directed to enter judgment dismissing this action and closing the case.

**SO ORDERED.**

**Dated:     New York, New York**
**           November 1, 2013          _____/s/_____**
**                                     John G. Koeltl**
**                           United States District Judge**

50